**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Philip ZANE et al., Defendants-
Appellants,
and
Morton S. Kaplan et al., Defendants.**

**Nos. 560, 561, Dockets 73–2401, 73–2450.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 14, 1973.

Decided April 1, 1974.

684

Sandor Frankel, New York City (Louis Bender, New York City, of counsel), for defendants-appellants Zane and Silverman.

John L. O'Donnell, New York City (Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, of counsel), for defendant-appellant Persky.

James E. Nesland, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. S. D. N. Y., John D. Gordan III, Asst. U. S. Atty., of counsel), for plaintiff-appellee.

Before LUMBARD and MANSFIELD, Circuit Judges, and GURFEIN, District Judge.[*]

MANSFIELD, Circuit Judge:

Upon this appeal we have been required to review the 4300-page record of a five-week jury trial, which resulted in the conviction of a lawyer and two accountants for filing a false Form 10K Annual Report with the Securities and Exchange Commission ("SEC"), 15 U.S.C. §§ 78o and 78ff, to determine whether there is merit to any of the numerous claims of error asserted by appellants. The multi-count indictment under which appellants were tried charged first that they, along with two other defendants, conspired to file the false Annual Report for Microthermal Applications, Inc. ("Microthermal") with the SEC (Count 1); second, that appellants actually filed the false report with the SEC (Count 2); and third, that appellants Zane and Silverman obstructed the SEC's investigation into the filing of the false report (Count 3). The remaining counts, 6–12, charged that Zane perjured himself before the SEC during its investigation.[1] On June 12, 1973, the jury rendered not-guilty verdicts on Counts One, Three, Six, Seven, Nine, Ten and Eleven. After a supplemental charge and further deliberation, the jury on June 13, returned a guilty verdict on Count Two, the substantive offense, and reported itself unable to agree on the remaining counts, Eight and Twelve. Appellants were each sentenced to a two-year split sentence (four months to be served and the balance suspended) on the basis of their conviction on Count Two. After considering the many points raised on this appeal, we find none that warrants a reversal.

The action in this Byzantine plot began in 1969 when the organizers of Microthermal, a new publicly held venture with no operating history whose shares were traded on the OTC market, raised $800,000 from a public offering of its stock in July of that year. The prospectus indicated to the investors that at least $300,000 of the proceeds would be invested in relatively safe securities such as certificates of deposit, government bonds or other interest-bearing obligations. Morton Kaplan, president of Microthermal, had other plans in mind for these monies. Between October of 1969 and January of 1970 he made cloaked transfers of $480,000 of the newly raised funds to Peter Galanis and Akiyoshi Yamada, principal operators of a hedge fund known as Takara Partners, of which they were members.

[*] Of the United States District Court for the Southern District of New York, sitting by designation.

1. Counts Four and Five were severed from the trial at the instance of Zane and Silverman.

No sooner had Kaplan completed these transfers as a loan in violation of the prospectus than he set about concealing that fact. After the first transfer in October, 1969, Robert Persky, secretary of Microthermal and partner in the law firm that acted as general counsel to Microthermal, drafted a contract that showed $240,000 of the $480,000 to have been invested in securities of the Delanair Corporation, which Takara Partners held in their portfolio. The purpose of this contract, according to Yamada, was to conceal the real nature of the transaction, which was to infuse money into Takara, a cash-poor company. In January, 1970, Kaplan transferred another $240,000 of Microthermal's money to Takara Partners, this time to bail out a personal investment he and Persky had made in the hedge fund.[2] This misuse of Microthermal's funds might never have been discovered if Takara Partners had been able to repay them. But repayment became impossible because the funds were dissipated, in this case through the purchase by Galanis and Yamada of high risk securities.

The moment of truth, when Microthermal would first face the necessity of disclosing the loss, loomed on the horizon as the time for filing Microthermal's Form 10K Annual Report with the SEC approached. (Microthermal's fiscal year ended on January 31, 1970.) That Report, which was due on May 31, 1970, required Microthermal to set forth the interest-bearing obligations in which it had presumably invested the $480,000, bearing the usual certificate of a certified public accountant to the effect that the statement reflected its audit made in accordance with generally accepted auditing standards and accounting principles. To satisfy this requirement Microthermal faced an audit by its accounting firm, Arthur Andersen & Co., which it was feared would not attach its certificate to the Report unless and until it was shown the securities representing the investment or other satisfactory evidence of Microthermal's ownership of them. Faced with this crisis, which was directly attributable to their own fraud, Kaplan and Persky sought to enhance their prospects of success in concealing the misappropriation of the funds by replacing Arthur Andersen & Co. with a firm that could be more "flexible" in its approach than generally accepted auditing standards and accounting principles would permit. They found such a firm in the persons of Philip Zane and Jerome Silverman. Over a series of meetings with Kaplan, Persky, Galanis and Yamada, the two accountants were introduced to the plot. They were asked to certify the existence of a certificate of deposit for the $480,000. Galanis for his part agreed to generate some documentation for the purported certificate.

Galanis proceeded to weave a tangled web of falsity. He enlisted the services of one Richard Kirschbaum who, in turn, approached Charles Fischer as a person who might be of assistance in creating evidence of a certificate of deposit which did not in fact exist. Fischer advised that it was impossible to borrow a certificate of deposit. However, he came up with a scheme that was to lead to the indictment in this case. In a nutshell this scheme was to purchase a certificate in Microthermal's name, obtain a letter from the seller confirming the purchase, and simultaneously sell the certificate to a third party, which would make immediate payment to the seller. If successful the plan would enable Microthermal to produce a letter from the seller confirming the sale to it, even though the sale would actually have been made to the third party. For such a plot expert timing, knowledge of the market, and acquaintanceship with the

2. Kaplan and Persky had together invested some $200,000 of their personal fortune in Takara Partners in a 90-day "put." When it became apparent that Takara Partners' cash flow was little more than a trickle, Galanis prevailed upon Kaplan to transfer another $240,000 of Microthermal's funds to Takara Partners to be used to repay Kaplan's and Persky's personal investment.

traders in it were essential. First Fischer called the Franklin National Bank on May 14, 1970, and under the name of Microthermal ordered a 90-day certificate of deposit (bearer form) for $500,000 to be delivered against payment at the Bank of New York. Meanwhile Fischer had convinced a friend and officer of the Neuwirth Fund, whose custodian bank was the Bank of New York, that he had a $500,000 certificate of deposit drawn on the Franklin National Bank for sale at a premium over the prevailing rate for such certificates. The officer of the Neuwirth Fund directed the Bank of New York to purchase the certificate for the Fund's account. Pursuant to Fischer's instructions the Franklin National Bank issued the certificate of deposit and delivered it to the Bank of New York. Upon the Neuwirth Fund's instruction the Bank of New York paid for the certificate and entered it in the Fund's account.

The Franklin National Bank all the while assumed that it had issued the bearer certificate to Microthermal as the purchaser. Indeed, Frank S. Woodruff, an officer of that bank, had written to Kaplan to confirm the purchase of the certificate for Kaplan's account at the Bank of New York. By letter dated May 18, 1970, Kaplan instructed the Bank of New York to deliver the $500,000 certificate to Persky's office. Understandably, the receipt of this letter was marked by some confusion at the Bank of New York where the only certificate in that amount had been purchased for the Neuwirth Fund, not for Microthermal. Gilbert Losurdo, the officer at the Bank of New York handling this certificate, spoke by phone with a man who represented himself to be Robert Persky and who again asked that the certificate be delivered to him. (At this point Persky, like Kaplan before him, apparently believed that a fraudulent certificate had actually been issued in Microthermal's name.) After hearing of the telephone call Galanis instructed Persky that the certificate was not held for Microthermal and that he should make no further calls to the bank that might upset their scheme.

Zane and Silverman played no role in procuring the certificate and the false documentation. But at a meeting after the certificate switch, which was attended by all the principals, the accountants' problem was discussed. At length it was decided that Zane and Silverman would certify the existence of the certificate of deposit on the basis of a letter from the Franklin National Bank to the effect that a $500,000 certificate of deposit had been issued to Microthermal. At the same time it was agreed that Zane and Silverman's fee for the audit previously set at $6,000, would be increased by $5,000. The earlier letter sent by the Franklin National Bank to Kaplan was considered inadequate because it suggested that the certificate had been issued to Kaplan's personal account rather than to Microthermal. A new letter was sought. On June 10 the Franklin National Bank sent another letter which contained the same flawed language as the original. A second letter on June 10 corrected the problem by stating that the certificate had been issued for the account of Microthermal. On the basis of this second letter Zane and Silverman certified that a certificate of deposit had existed for Microthermal as of January 31, 1970. The Form 10K Annual Report filed with the SEC thus included the certified financial statements showing Microthermal's cash and cash items as $525,024 when in fact at least $500,000 of this cash did not exist in any form.

The serpentine course of the conspiracy was traced at trial largely through the testimony of Galanis and Yamada. The two stood accused of a series of other fraud and tax offenses and it can be supposed that it was more than a trace of self-interest that led them to cooperate with the government. The government also introduced testimony that Zane and Silverman's work papers were wholly inadequate to certify the existence of the certificate of deposit and the funds underlying that certificate.

Zane and Silverman never attempted, for example, to verify whether Microthermal had an account at the Bank of New York or held a certificate there in its name. Their work papers did make an implausible attempt to cover the period from October 1969 through May 1970, when the Franklin National Bank certificate was supposed to have been issued to Microthermal, by showing several certificates of deposit as having been issued in October and January with maturity dates on May 14, 1970. There is, however, no evidence of any of these earlier certificates; indeed, Microthermal's books reflect neither their issuance nor their rollover at maturity on May 14. Furthermore, Silverman and Zane show these certificates as earning 6.75% interest though a government witness testified that during the relevant period banks were prohibited from paying any more than 6.25% interest on such certificates. Against these proofs Persky, Zane and Silverman offered only the defense that they believed in the existence of the $500,000 certificate of deposit and in the truth of the second Franklin National letter issued on June 10, 1970.

After deliberating for almost two days the jury acquitted all the appellants on Count One, the conspiracy charge; appellants Zane and Silverman on Count Three, charging the obstruction of the SEC investigation; and appellant Zane on various counts charging him with perjury before the SEC. The next morning the judge delivered a modified Allen charge to the jury. After further deliberation the jury returned a guilty verdict against all the appellants on Count Two, the substantive count which charged that they actually filed the false report with the SEC.

## ISSUES RAISED BY ALL APPELLANTS

The first question to be considered is whether the jury's not-guilty verdict with respect to Count One (conspiracy to file the false Form 10K Annual Report) barred it from later entering a separate verdict of guilty with respect to Count Two (substantive offense of filing the false Form 10K Annual Report itself). The jury returned a partial verdict acquitting appellants on several counts, including Count One, and retired for the night without having rendered a verdict on Counts Two, Eight and Twelve. On the following morning the jury, after receiving a modified Allen charge from the court, retired for further deliberations. Shortly it sent a note to the judge indicating that one juror felt that he could not change his vote on Count Two without changing his vote on Count One. At this point counsel for the appellants moved for a mistrial. The court denied the motion and instructed the jury that it was too late to change on Count One (as to which a verdict had been entered), that Counts One and Two were separate and distinct offenses and that the jury should consider Count Two. Zane and Silverman objected to this instruction. Indeed, immediately after the partial verdict of acquittal they had moved that the remaining counts be dismissed since there was no rational way—as far as they were concerned—that the jury could return any verdict but not guilty on the other counts. They argued that the two counts were virtually identical and that since the jury had found no agreement to file the false Annual Report as alleged in Count One it could not find that appellants aided and abetted the filing of the report as charged in Count Two. The jury, however, after further deliberation, returned a guilty verdict on the substantive offense.

In a supplemental brief received after the argument appellants urge that the verdict of not guilty on the conspiracy count must act as a bar to the later verdict of guilty on the substantive count. The government has replied that the problem is really just a variation on a familiar theme for which there is an authoritative and well-settled answer: that the courts will not speculate on inconsistent verdicts and that a jury's determination on one count in an indictment has no estoppel effect on its determina-

tion on other counts at the same trial. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); United States v. Carbone, 378 F.2d 420 (2d Cir.), cert. denied, 389 U.S. 914, 88 S.Ct. 242, 19 L.Ed.2d 262 (1967). However, appellants correctly point out that the particular sequence in this case is novel. In the usual case the inconsistent verdicts are simultaneously returned; here the verdicts were separated by further deliberations. Appellants argue that this temporal factor distinguishes this case from the traditional rule and brings it closer to Sealfon v. United States, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948), where the Court applied the principle of res judicata to bar a subsequent prosecution on a substantive offense after an acquittal on a related conspiracy count, than to Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L. Ed. 356 (1932), where the Court declined to upset inconsistent verdicts simultaneously rendered in the same trial. We think not.

■ It is well settled that even plainly inconsistent jury verdicts, simultaneously rendered are the jury's prerogative. The rule, as announced by Judge Learned Hand in Steckler v. United States, 7 F.2d 59 (2d Cir. 1925), and confirmed by Justice Holmes in Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), is that consistency in jury verdicts is not required. That the rule retains all its vitality today is evident from our steadfast adherence to it. See, e. g., United States v. Handel, 464 F.2d 679 (2d Cir.), cert. denied, 409 U.S. 984, 93 S.Ct. 326, 34 L.Ed.2d 249 (1972); United States v. Catalano, 439 F.2d 1100 (2d Cir.), cert. denied, 404 U.S. 825, 92 S.Ct. 56, 30 L.Ed.2d 53 (1971); United States v. Carbone, 378 F.2d 420 (2d Cir.), cert. denied, 389 U. S. 914, 88 S.Ct. 242, 19 L.Ed.2d 262 (1967); United States v. Magnus, 365

F.2d 1007 (2d Cir. 1966), cert. denied, 386 U.S. 909, 87 S.Ct. 856, 17 L.Ed.2d 783 (1967).[3]

It is equally clear that the principle of res judicata recognized in Sealfon v. United States in the setting of *separate* prosecutions has no application to the inconsistent verdicts on counts tried together under a single indictment. United States v. King, 373 F.2d 813 (2d Cir.), cert. denied, 389 U.S. 881, 88 S.Ct. 120, 19 L.Ed.2d 174 (1967); United States v. Marcone, 275 F.2d 205 (2d Cir.), cert. denied, 362 U.S. 963, 80 S. Ct. 879, 4 L.Ed.2d 877 (1960).

■ Appellants argue that the rule, which recognizes that compromise or an indication of leniency may underlie apparently inconsistent verdicts, should not apply here because no such considerations could have played a part in the jury's verdicts in the present case, since it reached a final verdict as to Count One, which it rendered before its further deliberation and verdict as to Count Two. However, the rule against disturbing inconsistent verdicts runs deeper than the principle of compromise. The validity accorded to such verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation. It is still possible, for instance, that because of the multiple counts with which it was confronted the jury, recognizing that it might still find appellants guilty on Count Two, decided to forego a possible guilty verdict on Count One as a means of "using its power to prevent the punishment from getting too far out of line with the crime," United States v. Maybury, 274 F.2d 899, 902 (2d Cir. 1960), and that after a night's sleep the thought of possible inconsistency first occurred to one juror. To this we might add the further possibility that the ju-

3. To be sure, this court has declined to extend to judges the same prerogative in returning inconsistent verdicts that juries have historically enjoyed. United States v. Maybury, 274 F.2d 899 (2d Cir. 1960). But at

the same time this court has made it clear that nothing said in *Maybury* reflects upon the continuing force of the *Dunn* rule. United States v. Carbone, *supra*.

rors, because of the inherently prolix nature of instructions as to the law of conspiracy, which have become increasingly complicated and intricate over the years, may have misapprehended some aspect of that crime.[4] The burdens imposed by the conspiracy charge have repeatedly been underscored by leading lights of the judiciary. Krulewitch v. United States, 336 U.S. 440, 445–458, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring); United States v. Bufalino, 285 F.2d 408, 417 (2d Cir. 1960) (Lumbard, C. J.); United States v. Falcone, 109 F.2d 579, 581 (2d Cir.) (L. Hand, J.), affd., 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); United States v. Peoni, 100 F.2d 401, 403 (2d Cir. 1938) (L. Hand, J.). Although further examples of conjecture as to the jury's mental gymnastics are possible, the danger inherent in such endless surmise, absent a set of specific and detailed findings of fact, is readily apparent. Faced with this prospect we have long since opted in favor of according controlling weight to the jury's prerogative.

■ In any event the return of a not-guilty verdict on a conspiracy count does not ipso facto constitute a bar to conviction on the underlying substantive offense even when there are separate prosecutions for the two offenses.[5] An acquittal on a conspiracy count would bar conviction on a substantive count only if it constituted a "determination favorable to the petitioner of the facts essential to conviction of the substantive offense. This depends upon the facts

adduced at each trial and the instructions under which the jury arrived at its verdict at the first trial." Sealfon v. United States, 332 U.S. 575, 579, 68 S. Ct. 237, 239, 92 L.Ed. 180 (1948). Applying these standards, the inconsistency in the jury's verdicts in the present case is more apparent than real. A careful reading of the indictment and the charge to the jury indicates that the jury could have acquitted the appellants on the conspiracy charge as alleged and consistently have convicted them on the substantive count. The acquittal was not necessarily a finding that there was no conspiracy or joint criminal venture, but only that the government had failed to prove the specific conspiracy alleged in Count One. The indictment specifically alleged three overt acts in furtherance of the conspiracy. The district court, in a rather restrictive instruction to the jury, advised them that they must find one of these three acts in order to convict on the conspiracy charge. In view of this charge the jury, though convinced that a conspiracy existed, may have entertained a reasonable doubt that any of the three specified acts occurred as alleged. This finding would not have prevented it from concluding on the basis of the other evidence that the appellants had actually committed the substantive offense. Indeed, the jury was permitted to reject any version of the conspiracy and still find that the appellants as individuals had committed the substantive offense.[6] For instance it could have based its verdict on a finding

---

4. With the aid of hindsight we think that Judge Wyatt would have been better advised, in response to the jury's note indicating one juror's doubt as to whether he could consistently render different verdicts on Counts One and Two, to have instructed the jury again as to the elements of the second count, since the jury's recollection of the charge, after two days' deliberations, may well have faded.

5. The courts have applied the principles of res judicata in appropriate instances as when the verdict of acquittal in a conspiracy trial constituted a necessary "determination favorable to petitioner. of the facts essential

to conviction of the substantive offense." Sealfon v. United States, 332 U.S. 575, 578, 579, 68 S.Ct. 237, 92 L.Ed. 180 (1948); United States v. Kramer, 2 Cir., 289 F.2d 909 (1961).

6. The statute under which the appellants were convicted reads in pertinent part: ". . . any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter . . ., which statement was false or misleading with respect to any material fact, shall upon conviction. . . . " 15 U.S.C. § 78ff(a) (1970).

that each of the appellants was aware of the false nature of the report and nonetheless lent his name to the filing. For the foregoing reasons we decline to overturn the jury's finding of guilt on Count Two.

Closely related to the claim of alleged inconsistency in the verdicts are several subsidiary points raised by appellants. They argue that the court's charge immediately before the jury retired to consider Count Two and its supplemental instruction given during the second deliberation were prejudicial. They maintain that the charge affirmatively encouraged the jury to return an inconsistent verdict on Count Two. Our finding that the verdicts were not necessarily inconsistent disposes of this argument. We think it appropriate to add, however, that at trial counsel for Zane and Silverman remarked with reference to the judge's modified Allen charge that it was "the fairest" Allen charge that he had ever heard. Whatever the potential of the standard Allen charge for promoting conviction—and we have repeatedly affirmed the district court's use of the charge in appropriate circumstances, see United States v. Tyers, 487 F.2d 828 (2d Cir. 1973); United States, v. Jennings, 471 F.2d 1310, 1313–1314 (2d Cir.), cert. denied, 411 U.S. 935, 93 S.Ct. 1909, 36 L.Ed.2d 395 (1973)—it was surely absent from the modified charge given by the judge here.

Appellants contend that it was error for the court, after its receipt of a note from the jury indicating that one of the jurors apparently thought that the two counts charged the same offense, to instruct the jury that Counts One and Two charged separate and distinct offenses. It is hornbook law that conspiracy and its underlying substantive offense are separate and distinct and can be charged as such. Callanan v. United States, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Appellants' real complant is not as to what the court said, as much as it is to what the court failed to say. Appellants asked the court to rule that the hearsay evidence admitted on the conspiracy count should not be considered on the substantive count. Their theory is that the jury, having rejected the conspiracy count, should not be free, in their deliberations on the substantive count, to consider evidence admitted because of the conspiracy count. The argument fails in at least two respects.

First, the hearsay evidence was admissible from the very outset on both the conspiracy and the substantive counts. Once the court is satisfied by a fair preponderance of independent evidence as to the existence of a joint criminal undertaking, ordinary agency principles permit hearsay statements of a colleague in furtherance of that enterprise to be admitted on a substantive count that is unaccompanied by any conspiracy count. See United States v. Rinaldi, 393 F.2d 97, 99 (2d Cir.), cert. denied, 393 U.S. 913, 89 S.Ct. 233, 21 L.Ed.2d 198 (1968); United States v. Messina, 388 F.2d 393, 395 (2d Cir.), cert. denied, 390 U.S. 1026, 88 S.Ct. 1413, 20 L.Ed.2d 283 (1968); United States v. Granello, 365 F.2d 990, 995 (2d Cir. 1966), cert. denied, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967); United States v. Annunziato, 293 F.2d 373 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961). This result is not changed by the inclusion of a conspiracy count or by the jury's acquittal on that conspiracy count. See Ottonamo v. United States, 468 F.2d 269, 273 (1st Cir. 1972), cert. denied, 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); United States v. Pugliese, 153 F.2d 497, 500 (2d Cir. 1945).

Second, the question of the admissibility of hearsay evidence on the substantive and the conspiracy counts was for the judge alone to decide. That determination of admissibility is not altered because the jury later decides to acquit on either of the counts. United

States v. Pugliese, supra. Nothing said in United States v. Wolfson, 437 F.2d 862 (2d Cir. 1970), is to the contrary. There the cause for concern arose from the fact that the hearsay evidence was not admissible on the remaining counts of perjury and obstruction of justice. No such situation exists here: the hearsay evidence was admissible against appellants on both counts.

■■ The next point raised by all appellants concerns the district court's voir dire. They allege that the court did not go far enough in its attempt to ferret out latent biases among the jurors when it refused to pose several questions propounded by appellants with respect to possible investment losses attributable to fraud or manipulation. In considering the issue we are bound by the accepted principle that the trial judge enjoys wide discretion in conducting the voir dire. See, e. g., United States v. Dennis, 183 F.2d 201, 226–228 (2d Cir. 1950), affd., 341 U.S. 494, 71 S.Ct. 857, 95 L. Ed. 1137 (1951). Here the district court more than met its responsibilities in this respect. Judge Wyatt acquainted the jury with the substance of each of the counts of the indictment, including the charge of filing of a false financial report on behalf of Microthermal with the SEC. He identified each appellant by name and profession and named the principal brokerage firms and companies that might figure in the case. Thus each juror should have been able to determine whether there was anything about the case generally that would make it difficult for that juror to serve impartially. The court's questions, of both a broad and narrow gauge, including whether the jurors had been the victims of a crime or involved in controversies with the SEC, were adequately calculated to plumb potential sources of prejudice. On the basis of the voir dire at least three prospective jurors asked to be excused, one because he had suffered losses at the hands of stock manipulators. The court's questions had obviously brought to the jurors' minds the same range of considerations as appellants sought through their proposed questions. Of course there is always the possibility that the consciences of other jurors might have been pricked and still further-flung potential sources of bias detected through an infinite regression of questioning or through the fortuitous wording of a particular question. But no system of justice can wait upon such adventitious occurrences. Wide discretion must be vested in the trial judge with respect to scope of the inquiry. Speculation will not suffice to overturn a voir dire when, as here, the court surveyed the likely sources of bias and prompted the jurors with evident success to consider for themselves what other sources of potential bias there might be. See United States v. Colabella, 448 F.2d 1299, 1302–1303 (2d Cir. 1971), cert. denied, 405 U.S. 929, 92 S.Ct. 981, 30 L.Ed.2d 803 (1972).

■ All the appellants object to the admission during the trial of the testimony of Lester Green, an SEC attorney who had worked on its Microthermal investigation. On cross-examination Persky, who testified in his own defense, was asked whether he had during an earlier interview with the SEC acknowledged that he had felt "uneasy" about the purported certificate of deposit in May and June of 1970. Persky denied having made such a statement. The government then called Lester Green, a participant in the SEC interview, to give contradictory testimony as to the statements made on this subject of uneasiness by Persky at the interview. Persky now maintains that this rebuttal testimony should not have been permitted because the meeting with the SEC was intended as a bargaining or settlement session.[7] Forewarned of the alleged purpose of the meeting, the trial

---

7. The government disputes this characterization of the meeting, noting that it occurred before the indictment was filed and that Persky was advised of his *Miranda* rights at the beginning of the meeting.

judge had ruled that Green could testify only as to Persky's statements and not as to the nature or purpose of the meeting. Any potential for prejudice to Persky was thus eliminated by the court's ruling. Persky's further objection that by allowing Green to testify regarding his admissions made at an attempted "settlement" of the case against him the court somehow or other involved itself in a violation of the Code of Professional Responsibility, EC5–9, DR5–101, is not supported by the cited text of that Code or by opinions issued with respect to it. Indeed it would be a rather extraordinary interpretation that would enable a witness to testify to one version of the facts without risking confrontation with a prior contradictory statement, whether or not given to the prosecutor at an unsuccessful plea bargaining session. There is no evidence that Persky's prior statement to the prosecutor was made "without prejudice" and it is doubtful, had such a condition been imposed, that the prosecutor would have continued with the session. In any event Green, although an SEC attorney, was not the prosecutor. Appellants' further contention that Green should not have been permitted to testify because he sat with government counsel throughout the trial is fully met by the settled rule permitting a government investigator, which was Green's function in this case, to do so. See United States v. Infanzon, 235 F.2d 318, 319 (2d Cir. 1956).

Zane and Silverman raise a more substantial objection to Green's testimony, based on their request for permission to cross-examine Green on the purpose of Persky's meeting with the SEC. The judge not only denied the request but denied Zane and Silverman any cross-examination of Green on the ground that Green's testimony was admitted against Persky only and not against them. Zane and Silverman argue that this ruling denied them their rights under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The *Bruton* point need not detain us. Persky himself testified and was subject to cross-examination by Zane and Silverman. The right of confrontation with the declarant was thus never in question. See Nelson v. O'Neil, 402 U.S. 622, 629–630, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971).

Zane and Silverman further contend, however, that the ruling denied them their general right to cross-examine a witness. The court, concerned with the possibility that they might attempt to get into the purpose of the meeting with the prosecutor, which it had ruled "off limits," relied on its instruction to the jury that Green's testimony was to be considered against Persky only. If this ruling were crucial we might doubt its soundness as a general principle, since the "rub-off" effect of testimony against a co-defendant may sometimes prejudice a defendant, despite an instruction that it is not to be considered against him, see Krulewitch v. United States, 336 U.S. 440, 454, 69 S. Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring); Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Furthermore, we fail to detect any impropriety in permitting such cross-examination, subject to whatever limitations are demanded by basic rules of evidence. We need not cross that Rubicon in this case, since nothing in Persky's statements as recounted by Green could have prejudiced Zane and Silverman. Green's very brief testimony regarding Persky's statements to the government regarding the June 10, 1970, meeting attended by himself, Kaplan, Silverman, Zane and Galanis tracked what Persky had testified to at trial, except for the reference to his "uneasy" feeling, which of course incriminated Persky, not Zane or Silverman, and except for Green's failure to quote Persky as placing Zane at the June 10 meeting, which if anything was helpful to Zane. Silverman's contention that Green's account of Persky's earlier statement indicated that Silverman knew of the first June 10 letter from the

Franklin National Bank [8] is not borne out by the record. Persky merely told Green that he had seen the first June 10 letter during a meeting on June 10 which Silverman also attended,[9] but Persky did not suggest that Silverman saw the letter. Because we find nothing in the statements attributed by Green to Persky that the jury might—in disregard of the court's instruction—have applied against Zane and Silverman, we conclude that they were not prejudiced by their inability to cross-examine Lester Green.

Appellants' bevy of objections to various other evidentiary rulings made by the court in the exercise of its discretion are likewise found to be without merit. Persky contends, for example, that despite the fact that Galanis' testimony covers some 772 pages of the trial transcript, of which 518 pages were devoted to cross-examination, the court improperly restricted his cross-examination of Peter Galanis on the subject of criminal charges pending against Galanis in Canada which alleged that he defrauded others there. The subject of these criminal charges and of the understanding Galanis had with the government concerning his cooperation in this trial, which was relevant to the witness' possible bias in favor of the government, was adequately explored and developed. The court acted well within its discretion, having in mind the length of the trial and the subordinate nature of the inquiry, in denying Persky's request to embroider upon the topic by reading the Canadian charges to the jury. See, e. g., United States v. Miles, 480 F.2d 1215, 1217 (2d Cir. 1973); United States v. Provoo, 215 F.2d 531 (2d Cir. 1954).

Zane and Silverman mount a more sustained attack upon the court's rulings on cross-examination. They object first to the court's curtailment of their examination of Galanis after Galanis admitted to having deceived other accounting firms concerning the assets of Takara Partners. Galanis had testified specifically that he had deceived the accounting firm of Laventhol, Krekstan, Horwath & Horwath, which certified a financial statement falsely representing Takara's assets to be $3.2 million, by submitting false statements and documents to the firm and that he had made substantial payments to the firm in the hope that the firm would take a liberal view of the audit of Takara Partners. The court acted well within its discretion in refusing to permit Zane and Silverman to pursue the point still further. They had sufficient testimony to argue to the jury, as they did in summation, that Galanis had simply deceived them in the same way he had deceived other accountants.

Zane and Silverman also assert that their cross-examination of Galanis was impaired by the court's refusal to treat statements made by Galanis to his probation officer as Jencks Act material (18 U.S.C. § 3500). The defense sought to establish that Galanis' statements to his probation officer were inconsistent with the testimony he was offering at trial. Because the court deemed statements made to a probation officer to be privileged, it declined to order their release to the defense. However, we need not decide this point, for our own examination of Galanis' statements to his probation officer reveals that the statements are consistent with his testimony

8. The first letter of June 10 suggested that a certificate of deposit had been issued to the personal account of Morton Kaplan. This was not considered adequate documentation upon which to certify the existence of a certificate of deposit in Microthermal's name. Hence the Franklin National Bank was asked to draft a second letter on June 10 showing the certificate as having been issued to Microthermal. Zane and Silverman denied having seen the first June 10 letter. The discrepancy between the two letters would normally have obligated them to do more checking than they actually did concerning the certificate.

9. Persky had himself on direct examination testified to the details of the June 10 meeting, including the facts that he saw the first letter at that meeting and that Silverman was present at the meeting.

at trial and that they do not contain any exculpatory material.

Appellants Zane and Silverman further complain of a restriction that was placed upon their cross-examination of Yamada, whose testimony covers 416 pages of the trial transcript, of which almost 200 pages reflect cross-examination. The restriction related to testimony on Count Four, which had been severed from the present case at the request of Zane and Silverman. The count dealt with the purported transfer of the $500,000 certificate of deposit from Takara Partners to a third-party on November 20, 1970, three months after the main conspiracy had been consummated. In his testimony before the SEC Yamada had said that he believed in November 1970 that the certificate of deposit existed. Indeed, there was a letter of November 20, 1970, signed by Yamada in which he acknowledged delivery of the certificate of deposit. At the present trial Yamada freely admitted that his testimony before the SEC was perjurious and that he knew that the certificate did not exist. Zane and Silverman attempted to persuade the jury to the contrary. They argued that Yamada was perjuring himself at trial and had been telling the truth about the certificate at the SEC hearing. To bolster this argument Zane and Silverman sought to introduce Yamada's letter of November 20, 1970. The government objected on the ground that the letter would bring the court into what was now a collateral matter, the transactions behind Count Four.

Had we been exercising a trial judge's discretion in the matter we probably would have admitted the letter as tangible impeaching evidence tending to support the argument that Yamada may have been testifying truthfully regarding the certificate before the SEC and lying at trial. On the other hand the letter was collateral in that expressions of Yamada's belief in November 1970, even if truthful—and of course Yamada contends that his SEC testimony was false—would not necessarily have served

to impeach his trial testimony relating to his beliefs in May and June of 1970. More importantly, the government maintains—and Yamada would undoubtedly testify—that the November letter was itself part of a continuing sham. If, as appellants urge, Yamada in fact believed that the certificates existed in the Spring of 1970, his motive in denying such belief would be something of a mystery. Moreover, if evidence of the letter had been admitted at trial, the government would have sought to prove that the November transaction, which had been severed as a charge, was a sham, as were the statements in the November letter. Under the circumstances we are governed by the principle that limiting such potential excursions into collateral matters is something best left to the discretion of the trial judge. See, e. g., United States v. Kahn, 472 F.2d 272, 279–280 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). Applying that principle here we cannot say that Judge Wyatt abused his discretion. In the five-week trial, marked by extensive cross-examination of Yamada, his credibility was thoroughly explored by counsel of recognized competence.

## ISSUES RAISED BY APPELLANTS INDIVIDUALLY

### Persky

Persky alleges that it was error to admit as evidence against him two phone conversations in mid-May with an officer of the Franklin National Bank (Frank Woodruff) and one such conversation thereafter with an officer of the Bank of New York (Gilbert Losurdo) to all of which, according to the testimony of the bank officers, a person representing himself to be Robert Persky was a party. As for the calls to the Franklin National Bank, Woodruff testified that after receiving a telephone inquiry in the first conversation (May 13) regarding the rate for a 90-day certificate of deposit, he received instructions in the second call (May 14) to deliver a 90-

day $500,000 bearer certificate to the Bank of New York and to send a confirmation to Morton Kaplan, c/o Microthermal.

Persky maintains that there was no proof that it was he who actually made the calls and indeed argues that one of the alleged co-conspirators, Fischer, accounted for all the calls to the banks. Fischer, a severed co-defendant and alleged co-conspirator, testified that at the instance of Richard Kirschbaum, a friend of Yamada and Galanis, he made the calls to Woodruff, representing only that he was calling on behalf of Microthermal and providing basic information as to the order for the certificate, the name and address of Microthermal, Persky's name and his firm address and the name of Kaplan.

The court admitted the evidence of the calls on alternative theories: that the jury might on the basis of circumstantial evidence find that Persky had actually made the calls, or that the jury might find that the calls were made by some other co-conspirator. If the court, in light of Fischer's testimony, had admitted proof of the calls to Woodruff solely on the ground that those calls were made by a co-conspirator, there would have been no error. The calls were an integral part of the alleged conspiracy and as acts in furtherance of that conspiracy were admissible against Persky even if it was a co-conspirator who actually made them. Pinkerton v. United States, 328 U.S. 640, 646–647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Persky's objection, however, is to that part of the instruction that permitted the jury to find that Persky himself had made the calls.

Although there was some circumstantial evidence (e. g., Woodruff's contemporary notes containing Persky's phone number) from which the jury might have inferred that Persky made the calls to Woodruff, it was weak. The more likely possibility appears to be that Fischer made the calls and that he either represented himself to be Persky or, because he gave Persky's name and firm, led Woodruff to believe he was talking with Persky. Under the circumstances it was error for the court to have submitted the case to the jury on the alternative hypothesis that Persky may have made the two calls. However, we do not consider the error to be sufficiently serious to warrant a new trial. There was ample independent proof of a conspiracy to which Persky was a party. The evidence of the calls was clearly admissible on the theory that the call was made by a co-conspirator. The court specifically noted to the jury that the bank officers could not identify the caller's voice. Persky testified that he did not make the calls. The government did not contend to the jury in summation that Persky had made the calls to Woodruff. In the face of very substantial proof of Persky's involvement in the alleged fraudulent scheme we believe that the submission of this admissible evidence on alternate theories could not have misled the jury.

Losurdo's testimony as to the purported Persky call to him stands on a different footing. There was ample circumstantial evidence that Persky did make the call to Gilbert Losurdo, in which the individual identifying himself as Persky demanded that Losurdo turn over to him a certificate of deposit belonging to Microthermal. The call had been preceded by a letter from Kaplan to the Bank of New York in which Kaplan directed that the certificate be sent to Persky. Mention was made of this letter during the telephone conversation with Losurdo. Kaplan had sent Persky a copy of this letter and so it was reasonable to infer that the caller was actually Persky. Moreover, Losurdo had written the telephone of Persky's firm below Persky's name on the letter received from Kaplan. Finally, Galanis testified that after he learned of the call to Losurdo, he contacted Persky and berated him for calling the bank. Persky

was silent during this reprimand, thereby strengthening the impression that it was he who made the call.

Persky argues that all this circumstantial evidence is for naught, because the testimony of co-conspirator Fischer accounts for all the calls to Losurdo. Fischer did testify that he spoke with Losurdo on two occasions,[10] but the topic of these conversations according to Fischer was the earlier call to Losurdo from Persky. Obviously Fischer's testimony as to his calls with Losurdo does not account for the "Persky" call to Losurdo. Indeed, it seems most improbable that Fischer, who arranged the certificate ruse, would endanger the success of the operation by making such a call in a futile attempt to obtain the certificate itself. We conclude then that there was sufficient circumstantial evidence to permit the jury to find that Persky had made this phone call. United States v. Fassoulis, 445 F.2d 13, 17 (2d Cir.), cert. denied, 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 100 (1971); United States v. Lo Bue, 180 F.Supp. 955, 956 (S.D.N.Y. 1960), affd. sub nom. United States v. Agueci, 310 F.2d 817 (2d Cir. 1962), cert. denied sub nom. Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). See United States v. Bonanno, 487 F.2d 654, 659 (2d Cir. 1973); Van Riper v. United States, 13 F.2d 961, 968 (2d Cir.), cert. denied, 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848 (1926).

■ Appellant Persky also assails the court's ruling that limited to five the number of character witnesses he might call before the jury. This is a matter left to the court's discretion, which was not abused. See United States v. Jacobs, 451 F.2d 530 (5th Cir. 1971), cert. denied, 405 U.S. 955, 92 S. Ct. 1170, 31 L.Ed.2d 231 (1972); Petersen v. United States, 268 F.2d 87 (10th Cir. 1959). Nor can we say that the court erred in any respect by using the standard jury instruction on the subject of character testimony. See United States v. Minieri, 303 F.2d 550, 554–555 (2d Cir.), cert. denied, 371 U.S. 847, 83 S.Ct. 79, 9 L.Ed.2d 81 (1962). See also United States v. Cramer, 447 F.2d 210, 219 (2d Cir. 1971), cert. denied, 404 U. S. 1024, 92 S.Ct. 680, 30 L.Ed.2d 674 (1972).

■ Finally, Persky, in what appears to be a technical objection, argues that the court's use in its instruction to the jury of the phrase "certificate of deposit" when the Annual Report itself referred to "cash or cash items" was improper. Since the cash or cash items were certified by the accountants Zane and Silverman as being in the form of a certificate of deposit, the court naturally equated the two phrases for purposes of its instruction. Persky's conviction rests upon the jury's finding that he personally knew the accountants were certifying the existence of cash and cash items on the basis of a nonexistent certificate. The court's instruction on the certificate and on the need for finding personal knowledge of the falsity of the Annual Report was appropriate and sufficient.

### Zane and Silverman

■ Zane and Silverman argue that the trial court deprived them of their right to call Morton Kaplan, president of Microthermal, as a witness. This claim is based on certain statements made by the court when it sentenced Kaplan on the date when the government rested its case against appellants, after Kaplan had before trial pleaded guilty to the conspiracy count. Before sentencing Kaplan the court expressed its opinion that Kaplan's statements at the time of his plea, several of which Zane and Silverman claim tend to exonerate them, were false. Zane and Silverman, relying on Webb v. Texas, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), now argue that this judicial expression of disbelief

---

10. Losurdo testified that he could not recall any conversations with a Fischer.

was error because it dissuaded Kaplan from testifying at trial in their favor. We disagree.

Two days before the scheduled sentencing, the court specifically inquired of counsel whether Kaplan was going to testify for Zane and Silverman. The court had expressed a willingness to defer the sentencing if Kaplan was in fact going to testify. The response of counsel for Zane and Silverman indicated that they had no plans to call Kaplan as a witness. On the next trial day after the sentencing of Kaplan, however, they suddenly developed an interest in Kaplan as a witness. Apparently this change of heart coincided with their motion for a mistrial based on the court's comments to Kaplan at his sentencing, upon which they now sought to find a way of capitalizing. The court properly denied the motion after learning that counsel for Zane and Silverman had not even attempted to subpoena Kaplan as a witness. In fact, Kaplan's attorney informed the court that Kaplan was still available to testify if called by any party. This communication belies appellants' claim that the judge's comments at sentencing somehow dissuaded Kaplan from testifying. In any event the appellants' failure to call or subpoena Kaplan as a witness disposes of any claim they might have, see United States v. Sanchez, 459 F.2d 100 (2d Cir.), cert. denied, 409 U.S. 864, 93 S.Ct. 156, 34 L. Ed.2d 112 (1972); see also United States v. Sclafani, 487 F.2d 245 (2d Cir. 1973), this particularly so when appellants had led the court to believe shortly before sentencing that they had no interest in calling Kaplan.

■■■■■ The failure to call Kaplan as a witness though he was available likewise disposes of appellants' argument that they should have been permitted to introduce the transcript of Kaplan's statements at sentencing. There was no justification for introducing the transcript, even if it assumed not to fall within the proscriptions of the hearsay rule, for Kaplan was available to testify in person. See United States v. Puco, 476 F.2d 1099, 1106 (2d Cir. 1973); United States v. Jones, 400 F.2d 134 (9th Cir. 1968), vacated on other grounds, 395 U.S. 462, 89 S.Ct. 2022, 23 L.Ed.2d 445 (1969). See also Rule 804 of the Proposed Rules of Evidence for the United States Courts and Magistrates, 51 F.R.D. 315, 438. Moreover, we find no basis under the declaration-against-penal-interest exception for admitting this hearsay evidence. The statements were not, as appellants would have us believe, against Kaplan's penal interests; on the contrary, if believed, the statements would tend to exculpate Kaplan (and by inference, Zane and Silverman). Finally, we find no error in the "missing witness" instruction given the jury with respect to Kaplan.

The only other point of any substance raised by Zane and Silverman relates to their request for a line-up or other informal identification before Yamada was permitted to identify them in open court. The identification issue assumed some importance because Yamada was to testify that he had met Zane only once, at a conspiratorial meeting that Zane himself denied attending, and that he had met Silverman twice. Zane maintains that Yamada would have been unable to identify him but for an impermissibly suggestive in-court confrontation when for a moment Persky (whom Yamada had identified), Zane and Silverman were seated alone at the defendants' table. Thereafter Yamada pointed out Zane and Silverman, stating that he did not know which person was Zane and which was Silverman. Zane and Silverman had made their original requests for a line-up before Yamada came to the witness stand.

■■■■■ In appropriate cases the question of suggestive in-court identification might best be obviated at the outset by ordering a line-up—as the court surely has power to do. United States v. Ravich, 421 F.2d 1196, 1202–1203 (2d

Cir.), cert. denied, 400 U.S. 834 (1970). See United States v. Soles, 482 F.2d 105, 109 n. 7 (2d Cir.), cert. denied, 414 U.S. 1027, 94 S.Ct. 455, 38 L.Ed.2d 319 (1973); United States v. Fernandez, 456 F.2d 638, 641 n. 1 (2d Cir. 1972). However, we do not find that the court's failure to order such a line-up here amounted to an abuse of discretion. The so-called "Rozzo" meeting in May or June 1970, testified to by Yamada as the occasion when he saw Zane and as one of the two occasions when he saw Silverman, lasted in excess of an hour. Silverman's own testimony also confirmed that he and Yamada had met once prior to the "Rozzo" meeting. Under these circumstances, while a hearing on the identification issue might, if requested (which it was not), have been advisable, see United States v. Kaylor, 491 F.2d 1127 (2d Cir. 1973); United States v. Mims, 481 F.2d 636 (2d Cir. 1973), it appears most unlikely that the in-court confrontation, even if labelled impermissibly suggestive, was the source of Yamada's identification. But even assuming it to have been capable of taint, the potential error was clearly harmless since Yamada's testimony as to the presence of Zane and Silverman at the "Rozzo" meeting was merely cumulative. Two other government witnesses, Galanis and Burns, whose identification of Zane and Silverman was unquestioned, placed the two accountants at the conspiratorial meetings. Yamada's identification of Zane and Silverman was in no sense central to this case. See United States ex rel. Cummings v. Zelker, 455 F.2d 714 (2d Cir.), cert. denied, 406 U.S. 927, 92 S.Ct. 1800, 32 L.Ed.2d 128 (1972); United States v. Abbate, 451 F.2d 990 (2d Cir. 1971); United States v. Baker, 419 F.2d 83 (2d Cir. 1969), cert. denied, 397 U.S. 976, 90 S.Ct. 1086, 25 L.Ed.2d 265 (1970).

We have examined all of the other points raised by the defendants on this appeal and find that none of them warrants discussion. The judgment of the district court is affirmed.