FILED

03/10/2017

Clerk of the
Appellate Courts



IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 5, 2017

## STATE OF TENNESSEE v. JOHN SMITH

**Appeal from the Criminal Court for Shelby County**
No. 10-02923     W. Mark Ward, Judge

_____

### No. W2016-00720-CCA-R3-CD

_____

The Defendant, John Smith, appeals his conviction of official oppression and his two year sentence in the county workhouse. He argues that his acquittal of a charge of rape and conviction of official oppression represent inconsistent verdicts and that the evidence was insufficient to support his conviction of official oppression. Following review of the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Charles S. Mitchell, Memphis, Tennessee, for the appellant, John Smith.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Amy P. Weirich, District Attorney General; and Greg Gilbert and Omar Malik, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The Defendant was indicted for rape and for official oppression under the theory of mistreatment of the victim. T.C.A. §§ 39-13-503, 39-16-403(a)(1). The Defendant, a Memphis police officer, was accused of stopping the victim, a woman who was walking down a street, and raping her behind a building.

The victim testified that on the morning of the incident, she left her hotel room and walked down the street to a gas station to purchase a cellular phone charger. She passed three police vehicles as she was walking. She testified that one of the police vehicles activated its lights and turned back around towards the victim. She stated that the officer, whom she identified as the Defendant, stopped to speak with her, and she informed him that she was going to the gas station. She described the Defendant as dressed in police uniform and alone in his squad car. The victim testified that the Defendant requested her identification and informed her that he was "running" her identification. She stated that he said, "Tell me the truth, what are you really doing?" She responded to the Defendant by explaining that she was simply going to the gas station to retrieve a phone charger. She testified that she had not committed any illegal act on the day of the incident.

The victim said the Defendant then exited the police vehicle, asked her "to back up," and inquired as to whether she had "anything on [her] that would stick or stab him" to which she denied. She asked the Defendant whether she was going to jail. In response, the Defendant said, "You're either going to suck my d*** and let me f***, or you're going to jail." She testified that she was scared of the Defendant after he threatened her. The victim stated that she called her boyfriend after the Defendant threatened her and that the Defendant said, "Yeah, call your boyfriend and tell him it's over with; you're going to jail." She testified that the Defendant then grabbed her arm and threatened her again. She rebuffed his threats, and he "grabbed [her] arm even tighter and pulled [her] behind the building." She stated that he pushed her down so that she was kneeling and told her he would not put on a condom. He unzipped his pants and "put his penis in [her] mouth." The victim testified that the Defendant made her stand up and pulled down her pants. As the Defendant was unbuckling his pants, she "took off running" back to her hotel room.

The victim testified that the Defendant did not ejaculate during this attack. She also testified that she did not see anyone else while she was behind the building with the Defendant. She did, however, see a man as she escaped the attack on her way back to the hotel. She stated that when she returned to the hotel room, her boyfriend let her inside, and they called the police. The recording of the 911 call was admitted. She admitted that during the call, she used a different name from her own while reporting the attack. The victim testified that the police responded about ten to fifteen minutes later and that she explained to police what occurred. The police officers took her to the Rape Crisis Center from the crime scene. At the Rape Crisis Center, she was subjected to a rape kit examination, including mouth swabs and saliva samples. She could not remember whether she told the forensic nurse what occurred during the attack. After the rape kit examination, she went to the police station, spoke with officers about the attack, and gave a written statement. The victim identified the Defendant in a photographic lineup.

She testified that she had previously seen the Defendant twice, including once "the night before this incident." The victim stated that the first time she encountered the Defendant, he was a responding officer to an incident involving her boyfriend and another woman. She admitted that at the time of her first encounter with the Defendant, she was "working the streets as a prostitute." She also stated that the Defendant said to her and her boyfriend, "If I catch your girl late [at] night, I'm going to hit her, and I'm not talking about paying for it." She took the Defendant's comment as a joke and "just laughed it off." She conceded that she believed the Defendant was likely insinuating that she was, in fact, a prostitute. She acknowledged that she had multiple convictions for theft of property valued under $500.

On cross-examination, the victim testified that the name that she provided as her own during the 911 call was, in fact, her cousin's name. She explained she used the alternate name to "dodge the police." She testified that the road where the attack took place is busy, even at 6:00 a.m. when the attack occurred. She also testified that at the time of the attack, the sun was not out and that the streetlights were on still. The victim stated that although she told the 911 operator that the Defendant had vaginally penetrated her, she was not penetrated vaginally by the Defendant. She explained the discrepancy by stating that she was possibly "overwhelmed" at the moment of the telephone call. The victim testified that she told the 911 operator that the Defendant had not ejaculated. She stated that her boyfriend, who is also her pimp, encouraged her to call the police and to specifically inform them that the Defendant had previously threatened to rape her. She also stated that she was "calm" during the 911 call. She recalled that the investigating police officers conducted a florescent fluid scan to look for bodily fluids on her person. The victim testified that during the attack, she spit behind the building where the attack took place and showed the investigating officers where she had spit. She testified that a man walked into the store before the Defendant took her behind the building. She conceded that in her statement to the police, she erroneously told them that the Defendant chased her. She clarified that the Defendant did not chase her once she began running away from the attack.

The victim admitted that while giving her formal statement to police, she informed them that she had been arrested only twice for prostitution, and she stated that she did not know that she actually had three arrests for prostitution in the six months prior to the attack. She acknowledged that her formal statement did not include information about her previous contact with the Defendant. She denied saying at an unrelated courtroom appearance that the Defendant was not the man who raped her.

On re-direct examination, the victim testified that she did not use her real name in her report to the police because she had an outstanding warrant and did not want to go to jail after making the report on the attack. She explained that she used her real name with

the police after they realized her attempt to conceal her true identity. She testified that she was "shaken up" by the attack and "had emotions flowing" when she made the 911 call. She stated that when she told the 911 operator, "[j]ust a little bit, but not all of it," she was referring to the fact that the Defendant had vaginally penetrated her with his penis, clarifying that she was not referring to ejaculation. On re-cross examination, the victim testified that she had pulled her pants up by the time that the Defendant began chasing her.

Officer Michael Malone, an officer with the Memphis Police Department, testified that he worked the same shift as the Defendant on the day of the attack. He stated that after he received a call to respond to a sexual assault by a police officer, he arrived at the scene and spoke with the victim. He testified that the victim told him that a police officer had raped her orally and described to him the location of the attack. He stated that the victim brought him to the scene of the attack and that he observed that there was little foot traffic.

Lieutenant Eric Hulsey with the Memphis Police Department was a sergeant in the sex crimes bureau on the day of the attack and was one of the responding officers to the crime scene. He testified that after leaving the crime scene, he went to the Raines Station precinct where he encountered the Defendant. Lieutenant Hulsey called a forensic nurse examiner to take a DNA sample and penile swabs from the Defendant. On cross-examination, Lieutenant Hulsey testified that he conducted a bodily fluids examination on the victim upon arrival at the hotel. He stated that he took DNA samples from the victim's cheeks and lips.

Major Carlos Davis with the Memphis Police Department worked in the sex crimes bureau on the day of the attack as the lead case officer. He testified that there were no video recordings of the back of the building where the attack took place. He believed that the bodily fluids examination revealed potential evidence on the victim. He testified that the back of the building where the attack took place would "have been difficult for someone to see." He obtained the Defendant's consent to take DNA samples during the investigation with a signed DNA sample consent form. Although Major Davis knocked on the doors of places neighboring the crime scene, he was unable to locate any witnesses. He also stated that the report from the Tennessee Bureau of Investigation (TBI) revealed the victim's DNA on the Defendant, but not the Defendant's DNA on the victim.

Ms. Judy Pinson, an expert in forensic nurse examinations, testified that she conducted a medical evaluation of the victim at the Rape Crisis Center. Ms. Pinson created a written report based on her memory of her interview with the victim and read from the report at trial. The report indicated that the victim told Ms. Pinson that she was

stopped by the Defendant under the pretext of an investigative frisk, that she had been orally raped by the Defendant, that the Defendant did not ejaculate, that the Defendant pulled her pants down, and that she was able to run away from the Defendant. Ms. Pinson stated that she looked for injuries on the victim consistent with the attack and took swabs of her mouth. Once she obtained the DNA samples, they were sent to the TBI for testing. She then went to the Raines Station precinct to obtain DNA samples from the Defendant. She obtained his signed consent, swabbed his mouth and penis, and scraped his fingernails for DNA samples.

Agent Lawrence James, an expert in DNA analysis, is employed by the TBI at their Memphis Crime Laboratory. He testified that in the first report he created, the results showed that the oral swabs from the victim tested negative for semen. He stated that he was asked to conduct a second report of a general DNA analysis. He also stated that the results from the second report showed that both the victim's DNA and the Defendant's DNA were present on the penile swab taken from the Defendant. Mr. James "determined that the probability of randomly selecting someone who would be a possible contributor to" the mixture of DNA found on the penile swab was between one in 157,200 and one in 709,200, depending on the race of the contributors.

The trial court instructed the jury on rape, sexual battery as a lesser-included offense of rape, and official oppression. The jury convicted the Defendant of official oppression and acquitted him of rape. The trial court sentenced the Defendant to two years to be served at the county workhouse.

## ANALYSIS

The Defendant challenges his conviction of official oppression. He argues that, in convicting him of official oppression and acquitting him of rape, the jury reached a conclusion for which there is insufficient evidence because the alleged rape was the basis for the official oppression charge. We note that the Defendant appears to be making an argument based on inconsistent verdicts and sufficiency of the evidence. The State argues, however, that case law does not require consistent verdicts and that the evidence is sufficient to support the conviction of official oppression.

Inconsistent verdicts may occur when multiple charges are brought against one defendant. *State v. Davis*, 466 S.W.3d 49, 72 (Tenn. 2015). "'The validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation.'" *Id.* at 77 (quoting *United States v. Zane*, 495 F.2d 683, 690 (2nd Cir. 1974)). So long as the appellate court determines that the evidence established

guilt on the offense of which the accused is convicted, inconsistent verdicts may stand. *Id.* at 76. In short, "inconsistent jury verdicts are not a basis for relief." *Id.* at 77.

"For instance, a defendant may be charged with committing both a felony murder and the predicate felony. The jury then may convict the defendant of the felony murder but acquit the defendant of the predicate felony." *Id.* at 72 (footnote omitted). Our supreme court has held that although these verdicts may be inconsistent, a "defendant is not entitled to relief from the felony murder conviction in this situation as long as the evidence was sufficient to support his murder conviction." *Id.* (citations omitted).

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not reweigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Official oppression occurs when "[a] public servant acting under color of office or employment" "[i]ntentionally subjects another to mistreatment or to arrest, detention, stop, frisk, halt, search, seizure, dispossession, assessment or lien when the public servant knows the conduct is unlawful." T.C.A. § 39-16-403(a)(1). "[A] public servant acts under color of office or employment if the public servant acts, or purports to act, in an official capacity or takes advantage of the actual or purported capacity." *Id.* § 39-16-403(b). Because the statute and case law do not provide a definition of "mistreatment," "we apply the statute's plain language in its normal and accepted use." *State v. Hogg*, 448 S.W.3d 877, 887 (Tenn. 2014). "Mistreat" is defined as "[t]o treat (a person or animal) badly" and, alternatively, as "to abuse." Black's Law Dictionary (10th ed. 2014). Accordingly, "mistreatment" in the context of the official oppression by a police officer would be police abuse of citizens.

- 6 -

Here, the jury acquitted the Defendant of rape and found him guilty of official oppression. The Defendant argues that he could not have been convicted of official oppression in light of his rape acquittal because the rape "was the basis for misconduct of [the] official oppression." For two reasons, this argument fails. First, as long as sufficient evidence exists to support a conviction, defendants are not entitled to relief on the basis of inconsistent jury verdicts. *Davis*, 466 S.W.3d at 77. Second, sufficient evidence exists to support an official oppression conviction on the basis of mistreatment—even notwithstanding the evidence of rape. *Id.* at 72.

The evidence showed that the Defendant threatened the victim with the ultimatum to either have sex with him or be brought to jail. The Defendant also grabbed the victim by the arm after she rebuffed his threats. He continued to squeeze her arm tighter as she resisted more and then brought her behind a building against her will. The victim was able to make an identification of the Defendant as the police officer that threatened and harassed her. Although the jury may not have credited the testimony and physical evidence of rape, they were at liberty to consider the additional evidence of threatening and harassing remarks and his physical force towards the victim. *State v. Melissa R. Cole*, No. W2011-00893-CCA-R3-CD, 2012 WL 4859127, at *22 (Tenn. Crim. App. Oct. 15, 2012) ("Juries are tasked with assessing the credibility of trial witnesses, and are generally free to reject, in whole or in part, the testimony of defense witnesses.") (citing *State v. Farmer*, 380 S.W.3d 96, 99-100 (Tenn. 2012); *State v. Sexton*, 368 S.W.3d 371, 389 (Tenn. 2012); *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). Accordingly, we hold that the Defendant's actions rose to the level of mistreatment of the victim while acting under the color of his employment as a police officer.

## CONCLUSION

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE