IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 19, 2016 Session

**STATE OF TENNESSEE v. SHERRY DEWITT**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-D-3631    Steve R. Dozier, Judge**

————————————

**No. M2015-00816-CCA-R3-CD – Filed November 10, 2016**

————————————

Following a jury trial, the Defendant, Sherry Dewitt, was acquitted of aggravated child abuse but convicted of aggravated child neglect. She now appeals as of right from that conviction, challenging the sufficiency of the evidence supporting the requisite mental state for that crime and that the child suffered an adverse effect to her health and welfare from the Defendant's alleged neglect as statutorily required. Following our review, we conclude that the evidence was sufficient to support a knowing mens rea, but we reverse the Defendant's conviction because there was insufficient proof that the Defendant's delay in informing the parents about the child's injuries or in seeking medical help had an actual, deleterious effect on the child's health and welfare. Therefore, the judgment is vacated, and the charge is dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court**
**Reversed; Case Dismissed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Peter J. Strianse, Nashville, Tennessee, for the appellant, Sherry Dewitt.
Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian K. Holmgren and Zoe K. Sams, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
<u>FACTUAL BACKGROUND</u>

The Davidson County Grand Jury indicted the Defendant for aggravated child abuse happening on March 29, 2011 (count one), and aggravated child neglect occurring between March 29 and March 31, 2011 (count two). See Tenn. Code Ann. § 39-15-402. The victim in this case was three-month-old R.M.,[1] and the Defendant was her nanny/caretaker. The Defendant proceeded to a jury trial in October 2014, where the following facts were adduced.

On September 3, 2010, the Defendant began caring for R.M. and B.M., R.M.'s older brother, while their parents worked. Both parents were medical doctors—S.M., their mother, was a pediatrician working with a private practice group, and C.M., their father, was a Vanderbilt resident studying to become an ear, nose, and throat surgeon. The thirty-three-year-old Defendant was paid $13 an hour and typically worked for the family on Tuesdays, Thursdays, and Fridays, although her hours often varied. Her duties, which were detailed in her written contract of employment, included the following:

> making and administering 3 meals a day as well as 1 to 2 snacks from food in the house; getting children dressed and ready for the day in the morning; taking [B.M.] to music class at Davis Kid[d] Bookstore on Tuesdays at 10:15; interacting with and stimulating children during the day; bathing children at the end of the day or earlier on days that the child ha[d] gotten dirty or hot outside; cleaning up with the help of the children the toys or mess from the day in the evening; preparing dinner for the family from food that's already in the house; loading and unloading the dishwasher[;] washing and changing children's be[dd]ing once a week and doing the children's laundry as needed; communicating with the employer daily by conversation or written notes about the [day's] activities and concerns.

The victim's mother became close with the Defendant while she was at home on maternity leave. Additionally, according to the victim's mother, the Defendant was a "great" caretaker for her family prior to this incident.

In March 2011, the family was considering selling their home, so the victim's father's parents came in town for the weekend to assist them in that endeavor, staying with the family from March 25 to March 27. During that weekend, the victim's mother injured her back. Although not a normal work day for the Defendant, on Monday, March 28, the Defendant came to the home and assisted the injured victim's mother with the children for several hours.

---

[1] It is the policy of this court to refer to minor victims by their initials. To further protect the minor's anonymity, we will refer to her relatives by their initials as well.

The Defendant worked a normal work day on Tuesday, March 29. The victim's mother testified that there was nothing unusual about R.M.'s behavior when she left for work that morning and that R.M.'s feeding habits had been normal in the preceding days. The Defendant took the children to Woodmont Park around 10 a.m., where she joined Karen Hutchinson, who was one of the victim's family's next-door neighbors and whose children were "very good friends" with R.M. and B.M. While at the park, the Defendant did not express any concerns to Ms. Hutchinson about R.M., and Ms. Hutchinson did not notice anything unusual with regard to R.M. According to Ms. Hutchinson, everyone left the park sometime between 12:00 and 12:30 p.m., although seeing as "it was a particularly beautiful, sunny day," they were possibly going to meet up again "for a play date after everyone had taken a nap." However, Ms. Hutchison's phone calls and text messages to the Defendant went unanswered that afternoon. When the Defendant eventually contacted Ms. Hutchinson, the Defendant, Ms. Hutchinson testified, "said something along the lines of it was a crazy day, or hectic afternoon or a busy afternoon[.]"

The victim's mother returned home from work around 6:00 or 6:30 p.m. that evening. According to the victim's mother, when she spoke to the Defendant before coming home, the Defendant "said that everything was fine" and did not indicate that anything was out of the ordinary. When the victim's mother arrived home, the Defendant was sitting at the dining room table; she was holding R.M., and B.M. was eating dinner. B.M. showed his mother that he had splinters in his hand, so the victim's mother took him to the bathroom to remove them. While in the bathroom, the victim's mother heard R.M. "start to scream." And although the cry was "louder and [more] unpleasant . . . than her normal cry," the victim's mother associated it with R.M.'s being hungry. The victim's mother then tried to nurse R.M., but she could not get R.M. to eat. R.M. could not be comforted.

According to the victim's mother, R.M. "started just screaming out and then would fall asleep and stop crying, and then [scream] out and then fall asleep and stop crying." The victim's mother described that R.M. "was much more fussy" than normal and that "something was definitely different" with R.M.'s behavior. The victim's mother asked the Defendant, "how long ha[d R.M.] been like this[,]" and the Defendant said, "since the bath, around maybe five." The Defendant also relayed that R.M. "had only taken an ounce and a half of the last two bottles," which was about half of her regular amount. The victim's mother stated that she found this information "a little bit strange" because the Defendant was "always so conscientious in texting [them] and contacting [them] if there was anything out of the ordinary" but, "when [the victim's mother] asked [the Defendant] how the day was, [the Defendant] said it was fine and hadn't brought" up R.M.'s abnormal mood. The victim's mother explained that "the only time that [R.M.]"

had "scream[ed] intermittently" like this was "when [R.M.] was sick with" Respiratory Syncytial Virus.

The victim's father came home between 7:00 and 8:00 p.m. that evening, and he likewise saw that R.M. was acting differently than normal. The Defendant was still there when he arrived because the victim's mother "needed her to stay and help because [R.M.] was crying so loudly and not doing okay[,] and [she] was still having to take care of some work on the phone, too." The Defendant left the home "maybe a little after 8:00" p.m. Later, the Defendant sent a text message checking on R.M. to see if she was any better. The victim's mother confirmed that the Defendant was "aware that [R.M.] was not acting in her normal state" that evening.

The victim's mother became growingly concerned about her daughter, so she gave her a physical examination. Not seeing any physical signs or causes for R.M.'s fussiness, the victim's mother gave the victim some "gas drops" and some Tylenol "for pain[,]" despite the fact that she "didn't know what [she] was treating." Thereafter, R.M. appeared to improve because she "sort of stopped screaming out" and went to sleep; however, it was also the child's bedtime. The victim's mother testified that R.M. "slept pretty well through the night[,]" although she woke up "several times that night for a little fuss but then would be consoled by putting her pacifier back in her mouth."

Earlier that evening, the victim's mother spoke by phone with Dr. Sarah Patterson, her pediatric group partner, asking Dr. Patterson her opinion of R.M.'s behavior. Dr. Patterson could hear R.M.'s crying in the background. Dr. Patterson advised the victim's mother to continue to monitor R.M. because "[t]hree-month-olds can be fussy" and to just "watch her and go from there." Dr. Patterson talked again with the victim's mother later in the evening, and the victim's mother was still worried. So Dr. Patterson told the victim's mother that, if she was that worried, then she should take the child to Vanderbilt hospital and "get her checked out." The victim's mother also sent a text message to another doctor friend of hers, Dr. Whitney Browning, stating her concern over R.M.'s behavior and symptoms. Dr. Browning said that she received at least two text messages and a voicemail message from the victim's mother that evening; however, Dr. Browning was not able to speak with the victim's mother until "much later" when R.M. had already fallen asleep. Dr. Browning comforted the victim's mother by saying that she was not being an overly anxious mother but that she was "[a]ppropriately concerned" about her daughter.

Pamela Love lived across the street from the victim's family and was B.M.'s nanny prior to the Defendant. She trained the Defendant before leaving and returning to school. Ms. Love communicated with the Defendant frequently. On March 29, the Defendant invited Ms. Love to accompany them to Woodmont Park in a voicemail message, but Ms. Love was unable to go. When Ms. Love returned the Defendant's call,

the Defendant did not answer. Later that evening, Ms. Love had another message from the Defendant, wherein the Defendant "said that she hadn't gotten back to me because things had gotten kind of crazy during bath time and she had missed my call."

On March 30, the following day, the victim's parents were both off work, and the victim's mother stayed at home with the victim while the victim's father ran errands and took the victim's brother to school. The victim's mother was asked how R.M. behaved that day: "She seemed better. She woke up with a runny nose and had a bit of a cold that morning and still wasn't maybe as happy as usual, but she was no longer screaming out in that cry and then falling asleep. That behavior was not there." The victim's mother further described that R.M. "was a little bit off [her] eating routine" that day. However, the victim's mother believed that the victim "was slowly improving." The victim's father also observed that R.M. was "a lot less fussy" that day.

During bath time on March 30, the victim's mother noticed "bluish discoloration on the right side of [the victim's] head" when she was washing the victim's hair. The victim's mother called the victim's father into the bathroom to look at the injury; however, at the point in time, they did not think it was a bruise and were not overly concerned. R.M. went to sleep that night around 9:00 or 10:00 p.m. and slept through the night.

After awakening on the morning of March 31, the victim's mother observed swelling on the left side of R.M.'s head, which was the opposite side of the child's head where they had seen the bluish discoloration the night before. When the Defendant arrived at the house that morning, the victim's mother informed the Defendant of the swelling on the child's head and showed it to her, but according to the victim's mother, the Defendant "seemed as if she had not seen it before." Now "very concerned," the victim's father, who was off work again, took R.M. to see her pediatrician, Dr. James Godfrey; the victim's mother arrived separately at the pediatrician's office after stopping by her workplace. According to the victim's mother, Dr. Godfrey palpated both sides of R.M.'s head, and when he pressed on the swollen side of R.M's head, the victim "cried pretty loud." Dr. Godfrey recommended that the victim's parents take her to Vanderbilt hospital for further examination.

While en route to Vanderbilt, the victim's mother called the Defendant and explained to the Defendant "that there could be some sort of injury under the swelling that needed to be examined." The victim's mother asked the Defendant "more than once if there was anything [the Defendant] could think of, any time that day that she was with them, when [the Defendant] left the room and came back and [the victim] was crying more than usual, anything out of the ordinary," and the Defendant said "no." She further explained to the Defendant that an investigation might ensue if the victim had unexplained injuries when examined at the hospital.

Once the child was presented to the emergency room, x-rays and a CT scan were ordered by the emergency room physician. Those images revealed that the victim had suffered two skull fractures, one to both sides of her head, "going from the top of her head down both sides[.]" Thereafter, the emergency room physician requested the services of Dr. Deborah Lowen, an expert in child abuse pediatrics. Dr. Lowen reviewed the imaging of R.M's head, spoke with the victim's parents to obtain a medical history, and examined R.M. During the examination, Dr. Lowen observed the following:

> [S]he was awake, alert, and happy, and looked like she was in really good condition. The . . . findings that were of note were on her head. On the right side of her scalp she did have a bluish-purple discoloration. It looked like a bruise.
>
> On the left side she did have a swelling, what's called a cephalohematoma, that was very tender when you touched it.

Dr. Lowen determined that R.M. suffered from two separate skull fractures, known as "bilateral skull fractures[,]" and the CT scan "showed that [R.M.] had a small bleed, a small subdural hematoma right underneath the fracture on the left." Dr. Lowen estimated that only about fifteen to twenty percent of babies with skull fractures also had bruising associated with the fracture. However, Dr. Lowen further described that, except for these injuries, the victim "looked like a very healthy little girl."

According to Dr. Lowen, a subdural hematoma signified that "the force with which the fracture was sustained was significant enough to cause bleeding underneath the skull." The left-side fracture also had a "depressed component" to it, meaning that "part of the fracture fragment [was] pushed inward toward the brain." Dr. Lowen explained that a depressed skull fracture was "more commonly [seen] when there's a higher degree of force than, for instance, a child simply falling." In Dr. Lowen's medical opinion, R.M.'s bilateral skull fractures resulted from two different blows to her head, which indicated non-accidental trauma and that R.M. was the victim of child abuse. When Dr. Lowen was asked, "Would there be a potential accidental mechanism that might account for accidental bilateral skull fractures?" she responded, "There is a case report of one of an accidental mechanism causing bilateral skull fractures, but that case is very different than [R.M.'s] situation." On the other hand, she could not "think of any other [accidental] mechanism besides [that] single case report that would account for bilateral skull fractures[.]" She clarified, "[E]xcept for in maybe a major car accident with an unrestrained baby who maybe had multiple blows during a car accident."

Dr. Lowen was then asked about the symptoms "a child that sustained this type of injury [would] experience contemporaneous with the trauma that produce[d] the fracture[.]" Dr. Lowen explained that the child would cry and show "signs of pain."

-6-

However, she also said, "They might not experience very much. They might not eat very well. They might have some vomiting. At some point they might develop swelling but maybe not at the same time." When asked how long the crying and pain would last, Dr. Lowen replied, "I've seen babies who cried for a little bit, cried for a half an hour, or hour or two, and then were fine. I've seen babies who were fussy for days. It's very variable depending [on] the baby, but they show signs of pain."

Although it was very hard to diagnosis a baby with a concussion according to Dr. Lowen, the symptoms that R.M. exhibited as relayed to Dr. Lowen by the victim's parents—not eating, incessant crying, irritability, and "after crying, falling asleep, arousing, crying, and falling back asleep"—were consistent with a "concussive injury[.]" Dr. Lowen explained that this type of injury might "persist for hours or days[,]" but it varied greatly. Dr. Lowen was asked how giving the child Tylenol might affect these symptoms, and she said that she would expect the child "[t]o have far less pain and to feel much better." And if the child "calm[ed] down" after receiving Tylenol, she might sleep through the night and feel better the following day, in Dr. Lowen's opinion. Furthermore, Dr. Lowen confirmed that, if R.M. "was not showing signs of more localized swelling," then "a doctor, somebody that's specifically trained," could "[a]bsolutely" have "missed that she had an underlying skull fracture[.]" The bluish discoloration on R.M.'s head during bath time on the evening of March 30, likewise, would not necessarily "lead one to conclude, even as a trained pediatrician, that there's an underlying skull fracture there[.]"

Based upon the imaging of R.M.'s head, Dr. Lowen could only say that the injuries occurred within the last week. Dr. Lowen explained that the "signs and symptoms" are much more important in determining when an injury occurred "[b]ecause radiology only gives us so much information[.]" Based upon all of the information provided to Dr. Lowen, she opined that, to a reasonable degree of medical certainty, R.M. was injured around the time she became symptomatic on March 29 during the "late afternoon, early evening hours[.]"

After Dr. Lowen's consultation, R.M. had a skeletal survey performed, "a series of x-rays of all the bones in the body[,]" and "an ophthalmology examination to look at her eyes." According to Dr. Lowen, "[t]he neurosurgery team was involved" in R.M.'s case because she had skull fractures and an "intracranial bleed[,]" so they needed to watch her "[i]n case it grows or there is a concern that it needs to be evacuated, to be removed." R.M. was admitted to the Intensive Care Unit and "woken up every hour through the night to monitor her . . . clinical symptoms." If she was "symptomatic," repeat CT scans would have been ordered to check "the bleeding and make sure it's not growing." Dr. Lowen testified that R.M. "was seen in follow-up by a neurosurgery team several months later."

Dr. Lowen did not believe that R.M.'s two-and-a-half-year-old brother could have caused these injuries "in the course of typical childhood play" or that he had the strength to inflict these injuries. When asked if the family dog could have been responsible, Dr. Lowen said that she "would want to know more about the dog[.]" However, she clarified that, because there were "two separate skull fractures[,]" "[t]he dog would have to do something twice[,]" and she could not "imagine" what the dog "could do to cause a skull fracture without causing skin findings like lacerations or abrasions[.]" Dr. Lowen described her "interactions with [the victim's] parents during [the] consult and the information [she] imparted to them and their reaction to that information" as "very appropriate." She explained that "they were mostly worried about [R.M.,]" that "[t]hey expressed appropriate sadness about the situation[,]" and that "they were just trying to figure out what had happened." Dr. Lowen admitted that she never interviewed the Defendant or took any history from the Defendant about how R.M. sustained her injuries.

Also on the morning of March 31, the Defendant left Ms. Love another message saying that "she needed to speak with [her] about [R.M.,]" "nanny to nanny." According to Ms. Love, "nanny to nanny" was their "code" for an emergency or something important. Ms. Love later spoke with the Defendant and told her that the victim's father had taken the victim to see the pediatrician because of a "knot" on the victim's head. According to Ms. Love, the Defendant "was concerned" and asked "if [Ms. Love] thought that they would be mad at her."

The victim's mother, after becoming suspicious of R.M.'s injuries, called Ms. Love and asked her to go over to the house because they did not want B.M. to be alone with the Defendant. The victim's father later called Ms. Love and told her that they had discovered that R.M. had a fractured skull, and he asked Ms. Love to discretely relieve the Defendant and let her go home. Ms. Love complied and did not inform the Defendant of the extent of the victim's injuries. According to Ms. Love, the Defendant was upset because "she didn't know what was going on with the baby" and "she was worried about her job, that she didn't know what she would do if they fired her." The Defendant did not elaborate. Ultimately, the victim's parents fired the Defendant.

Mary Alice Young, a Child Abuse Investigator with the Department of Children's Services ("DCS"), interviewed both the victim's parents and the Defendant regarding the cause of R.M.'s injuries. The DCS investigation failed to determine how R.M. received her injuries, although Ms. Young did note that the "timeline provided by all caretakers indicated that something happened to [R.M.] to cause a significant change in behavior" on March 29.

The Defendant testified in her own defense and denied ever harming R.M. in any way. According to the Defendant, R.M. was "fussy" most of Tuesday, March 29, which she attributed to a lack of appetite and the absence of a bowel movement.

The Defendant also presented Detective Thomas Rollins of the Metropolitan Nashville Police Department who was the investigator assigned to R.M.'s case. After interviewing all the parties involved, Det. Rollins "suspended" the case on June 28, 2011, because he could not confidently identify a perpetrator. In his opinion, it could have been either of the victim's parents, her brother, or the Defendant. He elaborated:

I immediately suggested that more than likely the event occurred sometime around [when] the child was having a bath or right after the bath when [she] was under the care of the [D]efendant and when the two-year-old sibling was there. But further on down through the opinion I noted that at that time I was not able to determine which one of the four subjects who were around the child within that time period could have caused the injury.

Det. Rollins stated that his efforts to conclude the investigation were frustrated by both the victim's parents, who had obtained legal representation, and the Defendant's refusing to cooperate and speak with him further.

Dr. Jonathan Arden also testified for the Defendant as an expert in the field of forensic pathology, "with a special interest in pediatric pathology." Dr. Arden testified that he could not form an opinion to any reasonable degree of medical certainty about the specific timing of when R.M.'s injuries were sustained.

The jury acquitted the Defendant of aggravated child abuse in count one but found her guilty as charged of aggravated child neglect in count two. The trial court imposed a sentence of twenty years. The Defendant perfected a timely appeal.

ANALYSIS

The Defendant raises a single issue on appeal: whether the evidence was sufficient to support her conviction for aggravated child neglect. An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

A person commits child neglect when that person "knowingly abuses or neglects a child under eighteen (18) years of age so as to adversely affect the child's health and welfare[.]" Tenn. Code Ann. § 39-15-401(b). As charged in the indictment and submitted to the jury in this case, "[a] person commits the offense of . . . aggravated child neglect . . . who commits . . . child neglect, as defined in § 39-15-401(b) . . . and: (1) [t]he act of . . . neglect . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1). If the victim is under the age of eight years old, aggravated child neglect is a Class A felony. Tenn. Code Ann. § 39-15-402(b).

In short, child neglect is composed of three essential elements: "(1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare." State v. Sherman, 266 S.W.3d 395, 404 (Tenn. 2008). In order to establish neglect, the State must first show that a defendant owed a legal duty to the child. Id. A defendant may be subject to criminal liability for child neglect when the defendant stands in loco parentis to the child. Id. at 405. A person stands in loco parentis when that person assumes the full responsibilities of a parent. Id. at 406 (citing Norton v. Ailor, 124 Tenn. 563, 566 (1883) (stating that when a stepfather admits a child into his household, he assumes "the obligation of the father as respects the support of his minor child")).

Further, child neglect is a nature-of-conduct offense, not a result-of-conduct offense. State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000). The statute merely requires that the act of neglecting the child must be knowing. Id. By way of illustration, a defendant satisfies the mens rea for child neglect when he or she knowingly leaves a child in a car for more than eight hours, but the mens rea requirement is not satisfied if he or she was unaware the child was present in the car at the time. Id. After the knowing

mens rea is established, then the next inquiry is whether the child suffered an adverse effect to the child's health or welfare. Id. If the child has suffered an adverse health effect as a result of defendant's knowing neglect, then the defendant has committed child neglect, regardless of whether the defendant knew what the result of the neglect would be. Id.

## A. State's Theory

At the outset, we feel it important to discuss the State's theory of prosecution regarding the separate counts of aggravated child abuse and aggravated child neglect. According to the Defendant, "the State made no attempt to elicit proof of neglect nor to distinguish the evidence supporting the aggravated child abuse charge from the aggravated child neglect charge." In essence, the Defendant is contending that the State pursued a conviction based upon two alternative theories of culpability regarding the same criminal behavior. However, a close review of the record reveals that the State presented separate theories for each charge.

Tennessee Code Annotated section 39-15-401(b), in separating the proscription of child-neglect/adverse-affect from child-abuse/injury contained in subsection (a),[2] refers to "abuse[] or neglect[]" as alternative bases for "adversely affect[ing] the child's health and welfare." (Emphasis added). Although prior legislative intent was to define child abuse and child neglect as distinct alternatives,[3] the statute at issue in this case defines child neglect as including abuse. See State v. Jose L. Hidalgo, No. M2011-01314-CCA-R3-CD, 2013 WL 1197726, at *11 (Tenn. Crim. App. Mar. 26, 2013).

During closing argument, the State presented its theory of the case:

> There are two chief differences between the alternative charges in this case of aggravated child abuse and aggravated child neglect. Child abuse requires that we prove that it happens other than by accidental means; that if the child gets injured through an accident it's not, by definition, an abusive act.

---

[2] The current statutes designate three offenses: child abuse, child neglect, and child endangerment. See Tenn. Code Ann. §§ 39-15-401(a) (child abuse), (b) (child neglect), (c) (child endangerment), 39-15-402(a) (designating subsections (a), (b), and (c) of Tenn. Code Ann. § 39-15-401 accordingly).

[3] Our supreme court has said that the 1998 amendment replaced the language of Tennessee Code Annotated section 39-15-402 in its entirety, with the purpose of distinguishing criminal conduct that caused injury to a child from criminal conduct that adversely affected a child's health and welfare by creating two distinct offenses, child abuse and child neglect. See State v. Dorantes, 331 S.W.3d 370, 385 n.15 (Tenn. 2011). Previously, child abuse and neglect had been a single offense that was committed by the alternate modes of injury or neglect. See State v. Mateyko, 53 S.W.3d 666, 668 n.1 (Tenn. 2001).

-11-

However, other than by accidental means is not part of the neglect statute. So you can neglect the welfare of a child, and even if the child is injured through an accident, you can be responsible if your neglect created the conditions under which the accident occurred.

The second difference is reflected in the indictment itself. . . . [N]eglect is a continuing course of conduct. Child abuse is a specific act at a specific time. In this particular case, [the Defendant] is indicted for events that encompassed not only March 29, 2011, but up and through March 31st of 2011.

. . . .

In this particular case, not only did [the Defendant] inflict these injuries but she concealed them. And during that period of concealment, knowing that this child has sustained some injury, she did not seek out any medical attention; did not alert the parents to what was going on; concealed the mechanism of what occurred even after the child was taken to the hospital demonstrating her continued neglect of the welfare of that little girl in a continuing course of conduct.

Significantly, the jury instructions for count two (the neglect offense) omitted the option that the neglect could have been committed by "abuse." See T.P.I—Crim. 21.02, Part B (providing the pattern instruction for offenses committed on or after July 1, 2005).

Accordingly, we discern from the record that the State sought one conviction, aggravated child abuse, based upon specified behavior of the Defendant (inflicting injury on March 29, 2011) and sought a second conviction, aggravated child neglect, based upon different behavior (failing to inform or seek medical help from March 29 to March 30, 2011). Stated another way, this is not a case where only one offense is charged, albeit in two different modes. See, e.g., Hidalgo, 2013 WL 1197726, at *11 (determining that the State's election clearly demonstrated that the prosecution was proceeding with alternate charges for the same conduct, i.e., treating a child "in a manner as to inflict injury" or abusing or neglecting a child "so as to adversely affect the child's health and welfare"). It is within this framework of prosecution that we analyze the sufficiency of the evidence supporting the Defendant's aggravated child neglect conviction.

*B. Mens Rea*

The Defendant first argues that the State failed to show that she engaged in knowing conduct; she does not dispute that she owed a legal duty to R.M. as the child's contracted caregiver or that R.M. was under eight years of age at the time of the injuries.

-12-

Specifically, the Defendant is contending that the State failed to establish the requisite knowing mens rea to convict her of aggravated child neglect "because there was no evidence offered that [she] knew the child was injured" and, moreover, that "it is clear that [R.M.'s] symptoms on March 29 were insufficient to establish the knowledge element of aggravated child neglect." The Defendant further avers, "[i]n light of the verdict as to [c]ount [o]ne, there is simply no proof that [the Defendant] was 'aware' of the victim's injuries and thus would have been under a duty to report, summon help or call 9-1-1."

The State responds that the Defendant's argument is refuted by the proof adduced at trial, noting that R.M. suffered two skull fractures, along with bleeding underneath her skull, during bath time on March 29, while in the exclusive care of the Defendant, and that the Defendant failed to report to the victim's parents that R.M. "might have been injured." According to the State, "[t]his evidence, when considered along with Dr. Lowen's testimony that R.M. had been a victim of non-accidental abuse," supports the Defendant's conviction for aggravated child neglect.

At the motion for new trial hearing, the trial court addressed the Defendant's argument. In determining that the evidence was sufficient to support the Defendant's conviction, the trial court reasoned as follows:

> The witnesses that placed this young child . . . in the exclusive care of [the Defendant] when within the expert testimony that injury could [have] occurred.
>
> And that State is right in terms of what they are saying here today in terms of the 3-29 the victim being different, fussy at the park where [the Defendant] had control. So from 3-29 to 3-30 when the victim was taken to hospital, was there—is there sufficient proof that there was—from a medical standpoint injuries that occurred and then lingered for several hours into the next day prior to getting medical attention? Yes.
>
> Apparently the jury finds that there is not sufficient proof that beyond a reasonable doubt that [the Defendant] inflicted the injuries but that she knew the child was injured, failed to give adequate, accurate, truthful information to the parents that would have [led] to earlier treatment. I mean, the testimony about the skull fractures, blueness on the side of the head, swelling on the side of the head, all of that testimony was presented. I mean obviously from . . . the parents' perspective, they would have addressed that earlier had they known about it, or had they been informed by [the Defendant] as to what happened.

-13-

Viewing the evidence in the light most favorable to the State, the evidence at trial established that three-month-old R.M. was left in the sole care of the Defendant on March 29, the day she became symptomatic from her injuries. The victim's mother noticed nothing unusual about R.M.'s behavior prior to leaving for work about 8:00 a.m. on the morning of the 29th. According to the Defendant, although R.M. had been "fussy" most of the day, R.M. began to cry and scream much more loudly than normal around bath time that evening. Ms. Hutchinson, who lived next door to the victim and her family, testified that R.M. behaved normally at the park that day. When the victim's mother returned home around 6:00 or 6:30 p.m., she noticed that "something was definitely different" with R.M., who was screaming and refusing to eat. According to the victim's mother, R.M. oscillated between screaming and sleeping that evening. The victim's mother also found it strange that the Defendant did not inform her of the change in R.M.'s behavior prior to her arrival home from work. The Defendant even stayed late with the family due to R.M.'s abnormal behavior, finally leaving around 8:00 p.m. Additionally, the victim's mother discussed the child's condition with two of her doctor friends that evening but chose a wait-and-see approach before taking the child for medical attention. R.M. was not examined at the hospital until two days later, where two separate skull fractures were detected, one on each side of R.M.'s head.

Dr. Lowen testified that R.M. would have become symptomatic around the time the fractures occurred. Ms. Hutchinson stated that she was in frequent contact with the Defendant, speaking with her "most afternoons"; however Ms. Hutchinson's phone calls and text messages went unanswered on the afternoon of March 29. When she finally did hear from the Defendant, the Defendant "said something along the lines of it was a crazy day, or hectic afternoon or a busy afternoon." Ms. Love, another neighbor of the family's and the family's previous nanny, testified that the Defendant left her a voicemail message on the evening of the 29th saying that "things had gotten kind of crazy during bath time[.]" Moreover, according to Ms. Love, during the message, the Defendant asked to speak with her "nanny to nanny" concerning R.M., which was their private code for an emergency or something of importance. The Defendant later expressed her reservation to Ms. Love that she might lose her job when R.M. was being examined by doctors. All of the evidence provides sufficient support for a rational juror to conclude that the Defendant's act of neglecting R.M. was knowing.

Despite this evidence, the Defendant claims that, by acquitting her of aggravated child abuse in count one, the jury necessarily rejected the State's theory that the Defendant was the cause of R.M.'s injuries, and thus, there was insufficient proof that she was aware of R.M.'s injuries which she knowingly neglected to report. However, we find this to be, in essence, an argument of inconsistent verdicts, which are permitted in this State. Our supreme court recently stated that "inconsistent verdicts of multiple charges against a single defendant may take the form of an inconsistency between a

-14-

conviction and an acquittal." State v. Davis, 466 S.W.3d 49, 72 (Tenn. 2015); see also Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973) ("This [c]ourt will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned."). The court "emphasize[d] that '[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation.'" Davis, 466 S.W.3d at 77 (quoting United States v. Zane, 495 F.2d 683, 690 (2d Cir. 1974)). Accordingly, inconsistent verdicts are unassailable absent a legal insufficiency. Id. at 73.

The Defendant's argument is premised on the notion that, because the jury acquitted her of aggravated child abuse, i.e., knowingly causing R.M.'s skull fractures, the evidence is insufficient to support her conviction for aggravated child neglect due to her failure to report those injuries to the victim's parents or seek medical help for the child. We disagree with this assertion. Here, any inconsistency in the jury's verdict in this regard can stand because the evidence is sufficient to establish a knowing mens rea for aggravated child neglect as discussed above. See, e.g., State v. Ashley Bradshaw, No. W2014-00175-CCA-R3-CD, 2015 WL 523688, at *7 n.3 (Tenn. Crim. App. Feb. 9, 2015) (noting, in a case where a two-year-old victim received extensive burns, that the verdicts for aggravated child abuse—based upon purposefully holding the victim in the water—and aggravated child neglect—based upon leaving the victim alone in the bathtub for five minutes—were "arguably inconsistent" but that such practice was permitted in this State), perm. app. denied (Tenn. May 18, 2016). The Defendant is not entitled to relief on this element of her aggravated child neglect conviction.

*B. Adverse Effect to R.M.'s Health and Welfare*

Challenging a second element of her conviction, the Defendant contends that the evidence did not show that the Defendant's neglect produced an actual, deleterious effect or harm upon R.M.'s health and welfare as required in State v. Mateyko, 53 S.W.3d 666, 670-71 (Tenn. 2001). In support of this position, the Defendant cites to several cases in which this court has held that the evidence underlying the convictions for aggravated child neglect was insufficient. See, e.g., State v. Marcos Acosta Raymundo, a.k.a. Marcos Raymundo Acosta, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207 (Tenn. Crim. App. Nov. 10, 2010) (concluding that the defendant's delay in seeking help for the victim until she collapsed did not have an actual, deleterious effect on her health because the victim's collapse was caused by the abuse, not the delay); State v. John Barlow, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772 (Tenn. Crim. App. Apr. 26, 2010) (holding that the evidence failed to demonstrate that the defendant's delay in seeking medical care for the victim caused additional brain damage when medical experts

-15-

testified generally to the risk of continued swelling of the brain but the evidence failed to show an actual, deleterious effect on the victim caused by the delay); State v. Denise Wiggins, No. W2006-01516-CCA-R3-CD, 2007 WL 3254716 (Tenn. Crim. App. Nov. 2, 2007) (holding that the burn from an iron, rather than the defendant's failure to seek medical help, caused the child's serious bodily injury); State v. Janet Huffine Dykes, No. E2001-01722-CCA-R3-CD, 2002 WL 1974147 (Tenn. Crim. App. Aug. 16, 2002) (reversing the defendant's conviction for aggravated child abuse through neglect, where the young victim was diagnosed as having sustained various fractures, some of which were healing, while others had occurred within forty-eight hours of the x-rays, because "there [was] no proof from which a rational jury could conclude that the delay—that is, the neglect—caused serious bodily injury as required by the statute").

The State does not respond to this portion of the Defendant's argument.[4] In her reply brief, the Defendant cites to State v. Lakeisha Margaret Watkins, No. M2009-02607-CCA-R3-CR, 2011 WL 2682173, at *24 (Tenn. Crim. App. July 8, 2011), stating that this court had unequivocally held that there must exist some evidence that the alleged act of neglect resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act of abuse. According to the Defendant, "Dr. Lowen offered no testimony to support a position that [R.M.] suffered from an injury separate from the initial fractures." The Defendant also notes that the State did not argue in its brief that R.M. "sustained additional injuries from the delay in seeking medical care."

Analyzing the child abuse and neglect statute in effect at the time, the Tennessee Supreme Court noted that "the statute itself does not define the phrase 'so as to adversely affect the child's health and welfare,' nor does it specifically address whether this phrase requires proof of some actual detriment or harm before criminal liability may be imposed." Mateyko, 53 S.W.3d at 666. The court held "that some proof of an actual, deleterious effect upon the child's health and welfare must exist before a conviction may be sustained" for child neglect. Id. The court noted that "by further including the 'adverse effects' element in the statute, the General Assembly must have intended that the State show something more than a risk of harm to a child's health and welfare before it could subject a defendant to criminal liability[.]" Id. at 671. The Mateyko children were found in an "indescribably filthy" mobile home overrun with cockroaches. Id. at 668. The Mateyko court summarized the conditions and effect on the children:

> Garbage and refuse were scattered throughout the home, and pungent odors of urine, old fried food, and human feces permeated every corner. . . .
>
> . . . .

---

[4] The State's brief focuses on the abuse. However, as discussed above, the alternative theory of abuse as a basis for the Defendant's aggravated neglect conviction was not included in the jury instructions.

. . . Despite living in these abhorrent conditions, however, the children appeared by all accounts to be in good health, and they did not exhibit any signs of illness or other affliction, except that one child was suffering from a cold. Their grandmother later testified that when the children first arrived at her house during the early morning hours of May 2, she believed them to be well-fed and "in perfect health."

Id. The court concluded that "these vile conditions did produce a risk of harm to the children's health, but fortunately for these children, they were removed from that filthy environment before any harm actually occurred." Id. at 672. Therefore, Mateyko affirmed this court's determination that the State had failed to prove child abuse through neglect. See id. at 677-78.

In accordance with the cases from this court cited by the Defendant, we agree that her conduct does not fit the definition of neglect under Mateyko. The record is devoid of any proof concerning what effect, if any, the Defendant's failure to inform the victim's parents or seek prompt medical care had on the victim's injuries. See Wiggins, 2007 WL 3254716, at *5 (noting that "[w]hile the question of whether the [defendant] sought medical treatment is relevant to [whether the defendant knowingly neglected the child] . . ., it is not dispositive of the second element required for conviction," which is whether the neglect resulted in serious bodily injury to the child) (alternation in original). There was also no proof that the victim suffered any injury after the initial trauma or that her condition worsened due to the passage of time. Given the above authority, we are unable to conclude that the Defendant's failure to inform the victim's parents of her injuries or seek medical treatment for the child resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act(s). See id. at *5. Therefore, we reverse and vacate the judgment of conviction for aggravated child neglect. See, e.g., State v. Jeffrey Scott Gold, No. E2012-00387-CCA-R3-CD, 2013 4278760, at *12-14 (Tenn. Crim. App. Aug. 15, 2013) (concluding same where victim had separate skull fractures on the right and left side of his head, a brain hemorrhage, a leg fracture, rib fractures, and significant bruising all over his body).

## CONCLUSION

In sum, we conclude that the evidence is insufficient to support the Defendant's conviction for aggravated child neglect. Accordingly, we reverse and vacate the judgment of the trial court. The charge shall be dismissed.

_____
D. KELLY THOMAS, JR., JUDGE