FILED

02/15/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 14, 2017

**STATE OF TENNESSEE v. TERANCE P. BRADLEY,
aka TERRANCE P. BRADLEY**

**Appeal from the Criminal Court for Davidson County
No. 2016-A-423      Cheryl A. Blackburn, Judge**

_____

**No. M2017-00376-CCA-R3-CD**

_____

The Defendant, Terance P. Bradley, aka Terrance P. Bradley, was convicted by a Davidson County Criminal Court jury of aggravated burglary, a Class C felony; reckless aggravated assault, a Class D felony; and assault, a Class A misdemeanor. The trial court sentenced him as a Range III, persistent offender to twelve years at 45% for the aggravated burglary conviction; as a Range IV, career offender to twelve years at 60% for the reckless aggravated assault conviction; and to eleven months, twenty-nine days for the misdemeanor assault conviction, with all sentences to be served concurrently with each other but consecutively to his convictions in another case. On appeal, the Defendant challenges the sufficiency of the evidence of his aggravated burglary and reckless aggravated assault convictions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Jay Umerley (on appeal); Frank E. Mondelli, Jr. and Nick McGregor (at trial), Nashville, Tennessee, for the appellant, Terance P. Bradley, aka Terrance P. Bradley.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Glenn R. Funk, District Attorney General; and Megan M. King and Leandra J. Varney, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case originated from a dispute between neighborhood children in a Nashville apartment complex. According to the State's proof at trial, on July 29, 2014, the fourteen-year-old son and twelve-year-old daughter of Patrick Guider, who was a resident of the apartment complex, got into an altercation with the Defendant's seven- or eight-year-old son.[1] At the time, the Defendant lived in an apartment in the same complex with several people, including: his girlfriend; his girlfriend's son, Hurley Brown; Mr. Brown's girlfriend, Shareka Hunter; and several of the adults' respective minor children.

A short time after Mr. Guider learned from his children about the altercation, Ms. Hunter, who was irate, came to Mr. Guider's apartment to complain about Mr. Guider's much older and larger son having beaten the Defendant's son. Mr. Guider's twelve-year-old daughter telephoned her mother, Crystal Hasty, and she quickly arrived at the scene with her boyfriend, Phillip Brinkley. The Defendant's sister, Latasha Wiseman, came to the scene at about the same time. Within five minutes, the Defendant rapidly pulled up in a white SUV accompanied by a teenaged son, Mr. Brown, and a third adult man who was never identified.

The Defendant demanded to know where Mr. Guider's son was and threatened that he was going to beat him or someone else. The Defendant then struck Mr. Guider in the mouth with his closed fist, knocking him backwards from his apartment stoop into his apartment. Mr. Brinkley struck the Defendant on the head with a flowerpot, and the Defendant, Mr. Brown, and the unidentified man began fighting with Mr. Brinkley inside the apartment. At some point, one or more of the three intruders kicked Mr. Guider in the ribs as he lay semi-conscious on the floor. The fight ended with the unidentified man firing multiple gunshots at Mr. Brinkley, who fled from the apartment chased by the three men. Mr. Guider sustained bruised ribs and a mouth injury in the melee, and Mr. Brinkley sustained three gunshot wounds.

The Defendant and Mr. Brown were subsequently indicted together for aggravated burglary, aggravated assault of Mr. Brinkley, aggravated assault of Mr. Guider, and possession of a firearm during the commission of a dangerous felony. The Defendant was also indicted for being a convicted felon in possession of a handgun. Following their joint trial, the Defendant was convicted of aggravated burglary, reckless aggravated assault of Mr. Brinkley, and assault of Mr. Guider and acquitted of the two weapons

---

[1] During his testimony, Mr. Guider estimated that the Defendant's son was seven or eight at the time.

charges. His co-defendant, Mr. Brown, was convicted of assault of Mr. Brinkley and facilitation of aggravated burglary.

## State's Proof

The State's first witness at the May 23-25, 2016 trial was Patrick Guider, who testified as follows. On July 29, 2014, he learned from his fourteen-year-old son, D.,[2] and twelve-year-old daughter, K., about a dispute they had just had with the Defendant's young son, P. According to his children, P. had thrown a stick that struck K. in the eye, and D. had warned him not to throw any more sticks at his sister.[3] A short time later, a "[v]ery agitated" Shareka Hunter came to the common area of the complex demanding to know why D. had beaten up P. Ms. Hunter was swearing and yelling and made a phone call in Mr. Guider's presence to the Defendant.

In the meantime, Mr. Guider's daughter called her mother, Crystal Hasty, to come over. Ms. Hasty arrived with her boyfriend, Phillip Brinkley, and an angry relative of the Defendant, Latasha Wiseman, also appeared on the scene.[4] Five to ten minutes later, the Defendant, driving fast, pulled up at an angle in front of Mr. Guider's apartment in a white SUV. The Defendant had three passengers: his thirteen- or fourteen-year-old son; the co-defendant, Hurley Brown; and a twenty-five to thirty-five-year-old man whom Mr. Guider had never before seen.

The Defendant exited his vehicle and walked toward Mr. Guider's porch stoop saying, "[W]here's that little [m*****f*****] at. If he's not getting it, somebody is." Mr. Guider, who was fifty-one years old at that time and walked with a cane, asked the Defendant to let him explain what had happened, but the Defendant grabbed a cell phone out of Ms. Hasty's hands, threw it on the ground, and struck Mr. Guider in the mouth. The Defendant's blow to Mr. Guider's mouth disconnected Mr. Guider's lip from his gum and caused him to fall backwards against his closed apartment door, knocking the door open as he fell to the floor inside. The Defendant, Mr. Brown, and the third man entered Mr. Guider's apartment. Mr. Guider testified that he was "being kicked all over" as he lay on the floor trying to protect his head. Mr. Brinkley came into the apartment to

---

[2] The children were referred to by their first names during the trial. In order to protect their privacy, we will refer to them by their initial only.

[3] On cross-examination, Mr. Guider acknowledged having testified at an earlier court proceeding that his son admitted he had hit the Defendant's son after the stick-throwing incident.

[4] Mr. Guider testified that he did not know exactly how Ms. Wiseman was related to the Defendant. Later witnesses, however, including Ms. Wiseman herself, identified Ms. Wiseman as the Defendant's sister.

try to help him, and the three intruders "fought all the way in through the kitchen" with Mr. Brinkley. From his position on the floor, Mr. Guider was able to see the butt of a gun in the Defendant's back pocket. He did not see either Mr. Brown or the unidentified man with a weapon.

Mr. Guider next heard gunshots and Mr. Brinkley pleading for his life. Mr. Brinkley then ran past him "out the front door as they were all chasing him shooting." Mr. Guider did not see who was doing the shooting. Although it is not entirely clear from his testimony, Mr. Guider indicated that he did witness the Defendant and his two adult companions get back into the SUV and flee the scene. He said he called 911, and both he and Mr. Brinkley were transported to the hospital. He identified the Defendant and Mr. Brown by their nicknames and their apartment number to the police officers who responded, and he later made positive identifications of both men from photographic lineups shown to him by a detective.

On cross-examination, Mr. Guider acknowledged that his son admitted to him that he had hit the Defendant's son. He denied that he argued with Ms. Hunter or Ms. Wiseman but acknowledged that his daughter's mother, Ms. Hasty, got into a heated verbal exchange with the women after she arrived at the scene. He said he never saw Mr. Brinkley hit the Defendant on the head with a flowerpot and denied that he made that statement to police. He also denied that he told the police that he saw the Defendant shoot Mr. Brinkley, testifying that he instead said that he saw the Defendant going toward the fight in the kitchen with a gun in his back pocket and then heard shooting. He acknowledged that, at the preliminary hearing, he testified that the Defendant had a gun in his pocket but that the unidentified man was the one shooting at Mr. Brinkley.

Phillip Brinkley testified that his girlfriend, Ms. Hasty, received a phone call from her daughter at approximately 6:00 p.m. on the day of the incident, which caused him and Ms. Hasty to drive to Mr. Guider's home. When they arrived three or four minutes later, he saw a belligerent woman screaming and cursing at Mr. Guider, who was seated in his chair outside his apartment and was not yelling or cursing. The Defendant pulled up in a large white SUV carrying three passengers: the co-defendant, Mr. Brown; a twelve or thirteen-year-old child; and a young man who appeared to be eighteen to twenty-four years old. All four of them jumped out of the vehicle, and the Defendant yelled, "[W]here is that [m*****f*****] at, if he don't get it, one of y'all going to get it." The Defendant grabbed Ms. Hasty's phone from her hand, threw it down, and punched Mr. Guider in the face, knocking him unconscious and into his apartment.

Mr. Brinkley testified that he reacted by picking up a flowerpot and hitting the Defendant on the head with it. He and the Defendant then started fighting inside the apartment. The Defendant's adult companions entered with the Defendant, and both of

them began fighting with Mr. Brinkley as well. Mr. Guider was still lying on the living room floor as the fight moved into the kitchen. Mr. Brinkley stated that he was in the midst of exchanging blows in the kitchen with the Defendant and Mr. Brown when he happened to glimpse the third man pulling a pistol from his pocket. Not wanting to get shot, he fought his way free and attempted to run from the apartment. The unidentified man shot him in the right leg as he was exiting the apartment, shot him again in the ankle after he had reached the porch, and shot him a third time in the left leg as he was outside attempting to run to his truck.

Mr. Brinkley testified that he made it to his truck, opened the back door, and looked back to see the unidentified man standing over him with his gun. He said he pleaded with the man not to shoot him. He then got into the truck, where D. was hiding on the backseat floorboard, and Ms. Hasty drove him to the hospital. He stated that as they were pulling off, he noticed the Defendant holding a gun in his hand as he was preparing to get into his own vehicle. All three men got into the vehicle, and the Defendant, who was driving, followed Mr. Brinkley and Ms. Hasty's vehicle until Ms. Hasty ran a red light and lost them. Mr. Brinkley testified that he positively identified the Defendant and Mr. Brown from photographic spreadsheets he was shown by the police at the hospital that night. He was never able to identify the third man.

On cross-examination, Mr. Brinkley testified that the Defendant was standing in the doorway to Mr. Guider's apartment when he struck the Defendant on the head with the flowerpot. He said the Defendant grabbed him and pulled him into the house, and almost simultaneously the Defendant's companions joined the Defendant in the fight: "When I hit him, immediately all three of them, they was on me. We was into the house and fighting." Mr. Brinkley acknowledged that neither the Defendant nor Mr. Brown shot him. He further acknowledged that the first two times he spoke with detectives, he did not mention having seen the Defendant with a gun or that he had hit the Defendant over the head with the flowerpot. On redirect examination, he agreed that he viewed photographic lineups during his first two meetings with detectives and that they did not question him in depth about the incident during those interviews.

Crystal Hasty corroborated Mr. Brinkley's account of why they drove to Mr. Guider's apartment and of the scene when they arrived, with a distraught woman yelling in Mr. Guider's face. She said she got out of her vehicle and the next thing she knew, the woman was "in [her] face." She recalled telling the woman that she was a concerned mother too and the woman responding, "[I]t's okay, he's on his way to take care of all of you." Within seconds, the Defendant pulled up in a large white SUV, parked in front of Mr. Guider's apartment door, and got out along with two other individuals. The first words from the Defendant were, "[W]here is that little [m*****f*****] at, if he ain't getting it, one of y'all are."

Ms. Hasty testified that before she was able to get her cell phone unlocked in her attempt to call 911, the Defendant yanked the phone from her hand and threw it to the ground. He then immediately punched Mr. Guider in the face, knocking him backwards into his apartment. As the Defendant's two companions rushed toward the apartment, she ran to her vehicle, where she found her frightened son hiding in the backseat. She heard gunshots behind her and, as she was backing her vehicle in order to get away, she saw Mr. Brinkley exiting the apartment and dragging himself to the vehicle. A man with a gun came out of the apartment behind Mr. Brinkley, and she thought for a moment that he was going to continue to shoot, but he did not. She then helped Mr. Brinkley into the vehicle and rushed him to the hospital. In her rearview mirror, she saw the Defendant, Mr. Brown, and the third man get back into their vehicle and follow her vehicle for a few blocks until she reached Gallatin Road. On cross-examination, she acknowledged she never saw the Defendant with a gun.

Metropolitan Nashville Police Officer Sandra Talavera, the first officer to respond to the scene, testified that she was met by Mr. Guider, who was obviously very shaken, and that she called for an ambulance to transport him to the hospital. On cross-examination, she testified that Mr. Guider complained of pain and was out of breath but did not have any obvious injuries.

Rhonda Evans, a civilian investigator assigned to the Metropolitan Nashville Police Department Crime Scene Investigation Section, identified various photographs of the crime scene, including photographs of blood spatter in the living room and kitchen area of Mr. Guider's apartment and three 9-millimeter shell casings and a bullet fragment recovered from the scene. Ms. Evans testified that two of the shell casings and the fragment were found in the parking lot right outside the apartment door, and the third shell casing was found just inside the apartment door.

Officer Douglas Belcher of the Metropolitan Nashville Police Department's Crime Scene Investigation Section, testified about the blood and saliva swabs he collected from the scene.

Rachel Mack, a forensic scientist in the DNA Unit of the Metropolitan Nashville Police Department's Crime Laboratory, testified that the Defendant's DNA profile matched the DNA profile of one of the presumptive blood swabs collected from the scene.

Detective Garrett Kidd of the Metropolitan Nashville Police Department's Criminal Investigations Division testified that Mr. Guider, who was "in a very frantic state" and appeared to be in pain, informed him that he had been knocked down and that

- 6 -

he suffered from numerous pre-existing health conditions. Mr. Guider gave an initial statement about what had happened while still on the scene and a more detailed statement after he had been transported to the hospital. Based on the information Mr. Guider provided about the perpetrators' nicknames and apartment number, he prepared photographic lineups from which Mr. Guider positively identified the Defendant and his co-defendant, Mr. Brown. Mr. Brinkley, in a separate procedure, also made positive identifications of the Defendant and Mr. Brown. The third suspect was never identified.

On cross-examination, Detective Kidd testified that he did not notice any bleeding from Mr. Guider's mouth. He said Mr. Guider reported that he had been hit on the head and kicked and scratched and that he showed him scratches on his arms and neck.

### Defendant's Proof

Shareka Hunter testified that on the day of the incident the Defendant's young son, P., came up to her crying and holding his head. Based on what he told her, she went to Mr. Guider's apartment and asked him if he had been outside when the children had fought. She said Mr. Guider was very angry, and they argued. Latasha Wiseman arrived, and Ms. Hunter explained to her what was happening. In the meantime, Mr. Guider continued to yell at her and Ms. Wiseman.

Crystal Hasty and Phillip Brinkley pulled up in their vehicle, and Ms. Hasty exited the vehicle, spoke in an angry tone to Mr. Guider about how the children were not supposed to be outside, and began arguing with Ms. Hunter and Ms. Wiseman. Next, the Defendant and Mr. Brown arrived at the scene. The Defendant walked to Mr. Guider and asked him what had happened, and Mr. Guider immediately began yelling at him. The two men were still yelling at each other when Ms. Hasty jumped in between them and began arguing with Mr. Guider while holding her cell phone in her hand and waving it around. The Defendant swatted the cell phone out of Ms. Hasty's hand, and Mr. Brinkley exited his vehicle, picked up a vase, and struck Defendant in the head with the vase.

Ms. Hunter testified that the blow to the Defendant's head caused him to stumble into Mr. Guider and that both men ended up crashing down together to the ground in front of Mr. Guider's apartment, knocking the door open. She said that Mr. Brown came over, helped the Defendant up, and asked if he was all right. Ms. Hunter stated that she backed away from the scene at that point and did not see anything else that transpired.

On cross-examination, Ms. Hunter testified that the Defendant had three passengers in his vehicle when he arrived at the scene: Mr. Brown and the Defendant's sons, "Jay" and "Quan Quan," who were approximately nine and ten years old. She acknowledged that when she spoke with an investigator after the shooting, she mentioned

- 7 -

nothing about how the Defendant's fall had caused the apartment door to come open or that Mr. Brown had walked over to help the Defendant to his feet.

Latasha Wiseman, the Defendant's sister, testified that she pulled up to the apartment complex to find Ms. Hunter in a verbal altercation with Mr. Guider. She said she learned from Ms. Hunter what had happened and asked Mr. Guider why he had handled the situation the way he did. As she and Mr. Guider were arguing with each other, Ms. Hasty pulled up, jumped out of her vehicle, and joined in the heated exchange. Next, the Defendant pulled up in his vehicle, joined the group, and swatted a cell phone out of the hands of Ms. Hasty, who was waving it around and threatening to call the police. The next thing she knew, the Defendant was struck from behind and a "big brawl broke out." She did not see the Defendant strike Mr. Guider and did not remain in the area to witness anything else. On cross-examination, she reiterated that she did not see the Defendant hit Mr. Guider.

The Defendant and Mr. Brown each elected not to testify. Following deliberations, the jury convicted the Defendant of aggravated burglary, reckless aggravated assault of Mr. Brinkley, and assault of Mr. Guider. The jury acquitted him of the two weapons charges. The trial court subsequently sentenced him to an effective term of twelve years as a career offender in the Department of Correction. Following the denial of his motion for new trial, the Defendant filed a timely notice of appeal to this court in which he challenges the sufficiency of the evidence for his felony convictions.

## ANALYSIS

The sole issue the Defendant raises on appeal is whether the evidence is sufficient to sustain his convictions for aggravated burglary and reckless aggravated assault. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and

resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, to sustain the conviction for reckless aggravated assault, the State had to prove beyond a reasonable doubt that the Defendant committed a bodily injury assault against Mr. Brinkley and that the assault either resulted in serious bodily injury or involved the use or display of a deadly weapon. See Tenn. Code Ann. § 39-13-102(a)(1)(B)(i), (iii) (2014). To sustain the conviction for aggravated burglary, the State had to prove beyond a reasonable doubt that the Defendant entered Mr. Guider's home without his consent and committed or attempted to commit a felony, theft, or assault. Id. §§ 39-14-403(a), -402(a)(3).

The Defendant argues that he is not guilty of aggravated assault because he did not display a deadly weapon or cause the serious injuries to Mr. Brinkley. He, similarly, argues that he is not guilty of aggravated burglary because the evidence was insufficient to show that he committed or attempted to commit a felony or an assault inside Mr. Guider's apartment. In support, he points out that the jury acquitted him of the weapons charges and that the witnesses testified it was the unidentified man, rather than the Defendant, who shot Mr. Brinkley. The State points to evidence that the Defendant possessed a weapon when he fought his way into Mr. Guider's apartment and argues that the jury, by its verdict, resolved any conflicts in the evidence in favor of the State. The State further argues that even if the Defendant was not the person who fired the weapon, he was still guilty under a theory of criminal responsibility.

- 9 -

We agree with the State that, regardless of his acquittal on the weapons charges, there was enough evidence from which the jury could find the Defendant guilty of reckless aggravated assault based on his use or display of a deadly weapon during the commission of the assault of Mr. Brinkley. It has long been held in this State that consistency in verdicts in separate counts of an indictment is not required. See Wiggins v. State, 498 S.W.2d 92, 93-94 (Tenn. 1973). As our supreme court has noted, "'[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation.'" State v. Davis, 466 S.W.3d 49, 77 (Tenn. 2015) (quoting United States v. Zane, 495 F.2d 683, 690 (2d Cir. 1974)).

We further agree with the State that even if the jury found that the Defendant did not himself use or display the weapon or cause the serious bodily injury to Mr. Brinkley, it could have still found him guilty of the offense under a theory of criminal responsibility.[5] A person is criminally responsible for the actions of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

Viewed in the light most favorable to the State, the evidence establishes that the Defendant, enraged at the fact that his young son had been beaten by Mr. Guider's teenage son, rushed to Mr. Guider's home with two adult companions, announced his intention of exacting revenge for his son's beating, and struck Mr. Guider a hard blow in the mouth with his fist, knocking him backwards into his apartment. The evidence further establishes that the Defendant, who was armed with a weapon, then entered the apartment with his two companions, without the consent of Mr. Guider, and that all three of them fought inside the apartment with Mr. Brinkley. As he fled, Mr. Brinkley was shot three times by either the Defendant or the unidentified man that the Defendant brought with him to the confrontation. This evidence was more than sufficient for the jury to find the Defendant guilty of the reckless aggravated assault of Mr. Brinkley and the aggravated burglary of Mr. Guider's apartment. We, therefore, affirm the convictions.

---

[5] As the State notes, it is unclear whether this theory was put before the jury, as neither the jury instructions nor the arguments of counsel is included in the record on appeal.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE